## UNITED STATES GYPSUM CO. v. BROWN, Price Administrator.

### No. 23.

United States Emergency Court of Appeals.
Heard July 8; 1943.

Decided Aug. 5, 1943.

Writ of Certiorari Denied Oct. 25, 1943.

See 64 S.Ct. 88, 88 L.Ed. ——.

Charles M. Price, of Chicago, Ill. (Robert A. Sprecher, of Chicago, Ill., on the brief), for complainant.

John O. Honnold, Jr., of Washington, D. C. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, Henry S. Sellin, and James A. Durham, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

Complainant, United States Gypsum Company, asks this court to set aside the General Maximum Price Regulation[1] and Maximum Price Regulation No. 188—Manufacturers' Maximum Prices for specified Building Materials and Consumers' Goods other than Apparel[2]—, as amended by Supplementary Order No. 31,[3] insofar as they require complainant in selling gypsum products in California, Nevada and Arizona to bear the burden of the transportation tax of 3%[4] in the case of certain shipments from its Midland, California, plant pursuant to sales to customers in those States.[5] The questions at issue arise out of one of two sharply distinct methods of pricing employed by complainant in the sale of its products from its plant at Midland. Its usual method, not here involved, is to sell to purchasers at prices f. o. b. the Midland mill. In these cases the purchaser pays and bears the burden of the freight from the mill to destination and his total cost varies in each case with the amount of the freight. The Price

[1] 7 F.R. 3153.
[2] 7 F.R. 5872.
[3] 7 F.R. 9894.
[4] Imposed by Sec. 620 of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Code, § 3475.

[5] Complainant filed a protest with the Price Administrator on December 17, 1942, which was denied on February 6, 1943.

Administrator concedes that in the case of these f. o. b. mill sales the purchaser must bear the burden of the transportation tax.

Complainant's other method of pricing, being the one involved in this case, is in certain areas (which in some instances include an entire State) to quote to its customers a delivered cost which is uniform throughout the area regardless of actual transportation cost from the mill to the particular destination in the area. It is complainant's practice in such cases to show on the invoice the uniform delivered cost figure, the amount of the freight, and the difference between the two. The customer pays the freight and remits the amount of the difference to complainant which takes that amount into its accounts as the proceeds of the sale. It will thus be observed that in these uniform delivered cost areas the net return to the complainant from the sales of its products varies inversely with the amount of freight incurred in delivering the product to the customer.

The first question presented to us for decision is whether the effect of the method of pricing for an entire area just described was to establish a uniform delivered price which if it was employed during the month of March, 1942, became complainant's maximum price for the area under the General Maximum Price Regulation and Maximum Price Regulation No. 188.[6] If so, it would seem to follow that the burden of any increase in transportation costs must be borne by complainant unless the regulations direct otherwise. The second question involves Supplemental Order No. 31, which directs that the transportation tax of 3% imposed by Sec. 620 of the Revenue Act of 1942 shall for the purposes of determining maximum prices, be treated as though it were an increase of 3% in transportation cost, and Amendment No. 39[7] of the General Maximum Price Regulation which incorporates directly into that regulation the provisions of Supplementary Order No. 31. The question is whether the order and amendment require complainant to bear the burden of the tax upon sales in its uniform price areas and if so whether they are arbitrary, capricious or otherwise unlawful.

We think that complainant's method of pricing in the areas in which it fixes a uniform delivered cost to its customers did establish a maximum delivered price which it is bound to maintain under the price regulations to the extent that it must itself absorb subsequent increases in transportation costs. The significant fact is that complainant arranged that the total amount to be paid by each customer in the area for the product delivered to him should be the same regardless of the varying freight rates to the several delivery points in the area. To achieve this end complainant was willing that the amount of its own net return from each sale should depend wholly upon the amount of the transportation charges involved in the sale. It is clear from the record that complainant's purpose was to assure to its customers throughout each such area a uniform cost for its products in order to meet the competition of other manufacturers who had previously adopted the same price policy. The Emergency Price Control Act and the price regulations here involved are concerned with the cost to the purchaser just as much as with the net price to be received by the seller. See Sec. 1(a) of the act, 50 U.S.C.A.Appendix, § 901(a), Sec. 1499.1 of the General Maximum Price Regulation (7 F.R. 3153) and Sec. 1499.-152 of Maximum Price Regulation No. 188 (7 F.R. 5873). Thus the sections of the two regulations just cited provide not only that no manufacturer shall sell or deliver an article at a price higher than the maximum price but also that "No person in the course of trade or business shall buy or receive" any such article at a price higher than the maximum price. Compare Galban Lobo Co. v. Henderson, Em.App.1942, 132 F.2d 150, 152.

Complainant contends that inasmuch as its customer actually pays the freight incident to each shipment into a uniform cost area its prices are in reality f. o. b. plant prices and not delivered prices at all. But we do not think that the character of the transaction depends upon whether the seller prepays the freight or allows payment of the freight by the buyer to be deducted from a gross price figure. To so hold would be to permit the substantive nature of the transaction to be governed by formal considerations of convenience which have no real bearing upon the substance of the transaction. Price control is a highly practical matter. Looked at practically,

---

6 Under both regulations the highest price charged by a manufacturer for any article delivered by him in March, 1942, became his maximum price.

7 7 F.R. 10454.

what complainant has offered to the public in these areas is a uniform figure at which they may obtain its products delivered to their communities. For all practical purposes of trade this is the holding out of a fixed uniform delivered price.

Other considerations support our view. Since complainant did not establish a schedule of net prices f. o. b. its mill to each point in these uniform cost areas it follows that in order to determine, on its own theory, its maximum price to a customer at a point in such an area to which there had been no delivery in March, 1942 (the maximum price period under the regulations), reference would have to be made to its uniform delivered cost figure for the area. Only by deducting the actual freight from the uniform delivered cost figure could the net return to complainant, which on its' theory would be its maximum price, be computed. It is thus apparent that complainant's uniform delivered cost must be the basis of its maximum prices.

Complainant's own practice points in the same direction. An interstate freight rate increase of 6%[8] was in effect from March 18, 1942 until May 15, 1943. If complainant had followed its own theory that its prices are varying f. o. b. prices it would have permitted its customers in the uniform delivered cost areas to bear this additional transportation expense. But it appears that for over a month after the increase complainant's customers receiving interstate shipments paid no more than the uniform delivered cost previously in effect and deducted the full freight, including the 6% increase, from that cost figure, in remitting to complainant. Moreover, when complainant finally decided to pass this added freight on to its customers, the exact increase in freight was not added to each shipment; on the contrary, general increases in complainant's uniform delivered costs were announced, calculated on the average to compensate complainant for the added freight expense.

 Without at this point passing upon his determination as to the party who must bear the tax, we think that the Administrator correctly stated in OPA Release OPA-2138 (April 2, 1943)[9] the applicable rules by which it may be determined whether a seller's price structure involves an f. o. b. plant or a delivered price, as follows:

"(a) If a seller quoted in the base period different delivered prices in different localities, but the return to him from the different prices, after deducting transportation charges from a particular point, was the same, then the seller's price structure is f. o. b. that point and the buyer may be made to bear the tax.

"(b) Where a seller's customers within a zone to whose various points transportation charges differed paid the same amount to receive delivery (including payments to both the seller and the carrier) the seller had a delivered price within the zone even though his quotations were expressed on an f. o. b. basis, and the seller must bear the tax.

"* * * It is important to keep in mind that there is a distinction between the physical act of paying the freight to the carrier and the actual burden of paying the freight. The responsibility, as between buyer and seller, for the payment of the transportation tax does not fall automatically on the one who actually paid the carrier, but rather on the one who actually bore the burden of the payment in the base period. Thus, if the return to the seller varied in each case because he has allowed transportation costs, the seller actually carried the burden of paying the freight, and the tax must be borne by him, not by the buyer who physically performed the act of paying the carrier but was reimbursed by the seller."

We therefore turn to the questions which have been raised as to the applicability and validity of the two maximum price regulations as amended by Supplementary Order No. 31 and Amendment No. 39. Supplementary Order No. 31 provided: "Notwithstanding the provisions of any price regulation, the tax on the transportation of all property (excepting coal) imposed by section 620 of the Revenue Act of 1942 shall, for purposes of determining the applicable maximum price of any commodity or service, be treated as though it were an increase of 3% in the amount charged by every person engaged in the business of transporting property for hire. It shall not be treated, under any provision of any price regulation or any interpretation there-

---

[8] The effect of this freight rate increase upon the prices here involved was one of the subjects of the protest by complain-ant to the Administrator but is not presented to this court by the complaint.

[9] Pike & Fisher OPA Service 2:2001, 2004.

of, as a tax for which a charge may be made in addition to the maximum price."

In the statement of considerations accompanying Supplementary Order No. 31 the Administrator said: "This will mean that where the price regulation establishes the maximum price on a delivered price basis which remains consistent despite variations in transportation costs, the seller will be required to absorb the tax. On the other hand, if the maximum price is established on a f. o. b. shipping point basis, the buyer will absorb the tax."

The language of Amendment No. 39 to the Maximum Price Regulation was substantially similar.

■ Holding, as we do, that complainant's uniform delivered costs in March, 1942, which included transportation expense, were its maximum prices under the price regulations, it is clear that under the price regulations as amended by Supplementary Order No. 31 and Amendment No. 39 the 3% transportation tax is required to be treated as an additional expense of transportation and therefore must be absorbed by complainant in the case of sales in the uniform delivered cost areas which it has established.

Complainant urges that while the letter of the order and amendment may require this result, they are, if thus construed, arbitrary, capricious and unwarranted by the act. It is contended that they are not directed toward accomplishing the purposes of the act because in the statement of considerations it is said that their purpose is to avoid uncertainty which would result if one seller passed the tax on to his purchasers and another did not. Stress is laid upon the Administrator's statement that "Since the tax is fairly small in amount, its impact under Supplementary Order No. 31 will, in most cases, place no undue burden on the person required to absorb it."[10]

■ We see no merit in this contention. The transportation tax, unlike many other taxes, is in its practical effect wholly analogous to an increase in the transportation rate, as the Administrator held in the order in question. Whether that increase is to be passed on by the seller to the purchaser and by him perhaps to the ultimate consumer may well have an important bearing upon the maintenance of the price structure. It is a factor which it is appropriate for the Administrator to consider. The mere fact that the increase is small and therefore will not bear too hardly upon either party to a sale is of no consequence. It is the cumulative effect of millions of small increases in prices and other costs throughout the economy which starts the inflationary spiral. See Lincoln Sav. Bank v. Brown, 137 F.2d 228. There is likewise no merit in complainant's contention that by this order the Administrator was seeking to control business practices in violation of the act. It is obvious that what he sought to do was to determine the parties by whom the tax was to be borne and to prevent its being passed on to ultimate purchasers.

It is argued by complainant that the order compels it to reduce its prices in violation of the act. Without considering under what circumstances the Administrator may reduce prices[11] it is clear to us that he has not done so in this case. For, as we have already shown, complainant's maximum prices in the areas in question are its uniform delivered cost figures. These it is not directed to reduce but merely to maintain intact without increase by reason of the transportation tax.

■ Finally, complainant contends that Supplementary Order No. 31 and Amendment No. 39 do not have general applicability and effect but create an improper classification in violation of the act. Complainant says that it and others similarly situated are placed in a special class which must bear the tax "even though they are not liable for and do not pay the tax". But here again complainant's argument fails because of the invalidity of its premise that it has not established a delivered price under which it must bear the burden of the tax regardless of whether it actually pays it. As has been pointed out, quite the contrary is true. Nor has complainant established that its practice of billing delivered prices with freight payment by the purchaser allowed as a deduction from the price is unique or even uncommon. On the contrary, it has been said that the practice has been commonly adopted in many industries, including the building material

---

[10] Statement of Considerations accompanying Supplementary Order No. 31.

[11] Sec. 2(c) of the act, 50 U.S.C.A. Appendix, § 902(c), expressly authorizes price regulations and orders to establish maximum prices below the prices prevailing at the time of the issuance of such regulation.

industry.[12] Also it is significant that of the many sellers affected, only complainant has filed a complaint seeking to set aside the order and amendment as they affect this situation.

Finally, we note that the classification adopted in the order and amendment was expressly approved by both the Senate and House Committee reports upon the bill.[13] In the Senate Report it is said: "Section 2(c) of the bill provides for flexibility in the establishment of maximum price and rent, and other, regulations under the bill. It authorizes classifications, differentiations, adjustments, and reasonable exceptions which in the judgment of the Administration are necessary or proper to effectuate the purposes of the bill. For example, classifications and differentiations may be made in terms of quantity, quality, or character of the use contemplated by the purchaser, or in terms of delivered prices on the one hand and f. o. b. prices on the other, or other conditions of sale. Differentiations of this character and many more that could be mentioned are essential in formulating workable maximum price regulations. * * *"

The complaint is dismissed.

30 C.C.P.A.(Patents)

---

[12] Geographical Differentials in Prices of Building Materials, T.N.E.C. Monograph No. 33, 76th Cong. 3d Sess. (1940, 13-14, 30, 287-8; Fetter, Masquerade of Monopoly (1931), 306; Frederick, Industrial Marketing (1934), 288.

[13] Sen. Rep. No. 931, 77th Cong. 2d Sess. (1942), 17; H. R. Rep. No. 1409, 77th Cong. 1st Sess. (1942), 6.