144 F.2d 361 (1944)
GILLESPIE-ROGERS-PYATT CO., Inc., et al.
v.
BOWLES, Price Adm'r.
No. 134.
United States Emergency Court of Appeals.
Heard July 13, 1944.
Decided August 24, 1944.
*362 Herbert M. Simon, of New York City, for complainants.
Nathaniel L. Nathanson, Associate Gen. Counsel, Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Chief, Court Review Price Branch, and Ernest R. Mortenson and Josephine H. Klein, Attys., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at New York July 13, 1944.
MARIS, Chief Judge.
The complainants, who comprise 8 of the 13 members of the bleached shellac manufacturing industry, in October, 1943, filed identical protests, supported by identical affidavits, attacking the maximum prices for bleached shellac established in Maximum Price Regulation No. 245 which had been issued on October 21, 1942.[1] The grounds of protest were that the prices were no longer generally fair and equitable because of increased costs of production and distribution and decreased profit margins which had occurred since the issuance of the Regulation. The protests were denied by the Administrator upon the ground that the protestants had failed to offer proof of facts which were necessary to be shown in order to establish that the maximum prices had ceased to be generally fair and equitable as measured by the pricing standards which he had adopted for determining that question. The complainants thereupon filed the present joint complaint in this court. It presents two questions for our consideration. The first is whether the standards which the Administrator uses to determine whether a maximum price is no longer generally fair and equitable within the meaning of the act are valid. The second is whether, if these standards are valid, the Administrator was right in holding that the complainants had failed to offer sufficient evidence to show that the maximum prices involved were no longer *363 generally fair and equitable as measured by the standards in question.
The basic standards which Congress has prescribed to guide the Administrator in applying wartime price control are set forth in the Emergency Price Control Act of 1942.[2] The Stabilization Act of 1942[3] added other basic standards but the latter are not involved in this case. The standards with which we are here concerned are contained in Section 2(a) of the Emergency Price Control Act which authorizes the Administrator to fix maximum prices which "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." Section 2(a) directs the Administrator, in fixing maximum prices in conformity with these standards, to give due consideration to the prices prevailing from October 1 to 15, 1941, and to make adjustments in such prices for relevant factors of general applicability, including speculative fluctuations and general increases or decreases in costs or profits, during and subsequent to the year ended October 1, 1941.
The Administrator recognizes that maximum prices which are generally fair and equitable when first promulgated may cease to be so by reason of the intervention of factors of the character just described and that under such circumstances the act requires him to authorize an increase in the maximum prices involved in order that they may continue to be generally fair and equitable. In order that he may carry out this statutory obligation in a uniform way he has adopted pricing standards by which to test the merits of applications for increases in maximum prices. These are the so-called industry earnings and product standards, the latter being used as a secondary guide in the case of a multiple-product industry. These administrative standards are described in a supplemental statement attached to the report[4] of the Committee on Banking and Currency of the Senate upon the bill (S. 1764) which became the Stabilization Extension Act of 1944,[5] as follows:
"Under this [industry earnings] standard, as a general rule, price increases are allowed to compensate for those cost increases which the industry cannot absorb without impairment of its normal peacetime earnings. As a guide for determining the extent to which price increases are required under this standard, the Administrator uses a representative peacetime period, usually the years 1936-39, the base period adopted by Congress for excess-profits taxes. Where this period is not fairly representative, the years included in the period are varied or other appropriate adjustments are made. If, during or subsequent to the year ended October 1, 1941, costs have increased more than gross income, then, to the extent that the industry's earnings, adjusted for changes in investment, provide a smaller return before Federal income and excess-profits taxes than the industry earned in the base period, the Administrator considers an increase in the industry's maximum prices to be required by law.
"Even though a price increase is not required under the industry earnings standard, an increase may be required under the so-called product standard which is used as a secondary pricing guide in the case of multiple-product industries. Under this standard, unless it had been the industry's practice to sell some of its products below cost, the Administrator considers himself required to increase the maximum price for any particular product sold by the industry, if its current maximum price should fail to cover the out-of-pocket costs incurred by the highest-cost firms which are not included in the industry's high-cost marginal fringe. Ordinarily an industry will be considered as a single-product industry even though the bulk of the product is produced by multiple-product firms if a substantial portion of the output is produced by single-product firms.
"Taken together with the industry earnings standard, the product standard means that maximum prices in a multiple-product industry are, as a general rule to be deemed generally fair and equitable if the industry (1) is receiving over-all earnings on all its operations equaling or exceeding its peacetime earnings, and (2) is not, except for the highest-cost fringe of producers, incurring an out-of-pocket loss on any particular line or product."
The complainants argue that these administrative standards do not correctly interpret the mandate of the act that maximum *364 prices shall be increased when they are no longer generally fair and equitable. They strongly urge that the statute does not authorize the industry earnings standard but contemplates the fixing of maximum prices for each individual product upon a level which will permit the realization of a profit thereon without regard to the other earnings of the industry. We cannot accept the complainants' contention, however, since we are satisfied that the standards which the Administrator has adopted as pricing guides to be used in determining when increases in maximum prices must be made are fairly calculated to carry out the mandate and purposes of the act.
It is settled by the decisions of this court that the mere showing of a cost increase in connection with a particular commodity does not of itself entitle the industry involved to a corresponding increase in the maximum price of the commodity. It must also be shown at the very least that the increase in costs relied upon has not been offset by a decrease in costs in another direction and that an unreasonable decrease in the profits of the industry derived from the sale of the commodity has actually resulted. Chatlos v. Brown, Em.App.1943, 136 F.2d 490; Lakemore Co. v. Brown, Em.App.1943, 137 F.2d 355; United States Gypsum Co. v. Brown, Em.App.1943, 137 F.2d 360, certiorari denied 320 U.S. 775, 64 S.Ct. 88; Spaeth v. Brown, Em.App. 1943, 137 F.2d 669; Philadelphia Coke Co. v. Bowles, Em.App.1943, 139 F.2d 349; Madison Park Corp. v. Bowles, Em.App. 1943, 140 F.2d 316; Interwoven Stocking Co. v. Bowles, Em.App.1944, 141 F.2d 696.
It follows that the industry earnings standard is valid when applied to a single-product industry. We think that it is equally valid when applied to a multiple-product industry in conjunction with the application of the product standard to the products dealt in by the industry.
The use in Section 2(a) of the statute of the phrase "price or prices of a commodity or commodities" and "maximum price or maximum prices" indicates that the statutory standard  "generally fair and equitable"  is not necessarily to be applied separately to the price of each individual commodity but may, in an appropriate situation, be applied to the aggregate of the prices of a group of commodities. An industry which customarily deals in a group of commodities presents such a situation. It is a phenomenon of our peacetime economy that a multiple-product industry which earns satisfactory profits on its over-all operations frequently finds it necessary or desirable to sell one or more items of its line of commodities at cost or even at a loss. The act does not compel changes in practices of this sort. Consequently the effect of the aggregate of the maximum prices of all the commodity items dealt in by a multiple-product industry upon its over-all operations and profits and the resulting increase or decrease in industry earnings is relevant in considering the question whether the maximum price of a particular item continues to be generally fair and equitable to the industry.
The effect of the maximum price of the particular item is, of course, equally relevant. The Administrator's policy, as we have seen, is to protect the industry against an out-of-pocket loss on every item not customarily sold at a loss. But the raising of the maximum price of a particular commodity to a level which would assure a profit upon its sale without regard to the total profits of the industry from its overall operations might not effectuate the purposes of the act to stabilize prices and prevent abnormal and unwarranted price increases. The factors involved in this problem and the reasons which support the Administrator's pricing standards have been well stated by his counsel in a memorandum submitted to the Committees on Banking and Currency of the Senate[6] and House of Representatives,[7] as follows:
"The problem, like most problems of price control, is one of choice between alternatives. It should be emphasized, however, that the choice is not between a standard which relies exclusively upon the test of over-all earnings and one which measures the fairness of a price solely in terms of cost and profit data applicable to the particular product. As the very existence of the product standard makes clear, the Administrator has never taken the position that any price for a particular product is fair, no matter how low, so long as overall peacetime earnings are equaled. Obviously the Administrator cannot maintain a ceiling price of 1 cent for a loaf of bread merely because bakers are doing well on *365 pies, cakes, and cookies. The product standard recognized this. It was developed precisely for the purpose of giving firm assurance that no such extreme variations from normal or appropriate price relationships would occur, or, if they occurred, be maintained. The choice accordingly is between the existing dual standards, which take account of both over-all earnings and single-product costs, and a single standard which disregards over-all earnings and looks exclusively to costs and profits on the particular product.
"A product standard which disregarded overall earnings would obviously have to provide a measure of profits appropriate to the particular product. This might be done in one of two ways. The first and best way would be to try to preserve for the industry generally aggregate peacetime profits for the particular product, adjusted for subsequent changes in investment. The second way would be to try to preserve a percentage or dollar margin of profit fairly representative of the industry's peacetime experience.
"The first of these two ways of measuring earnings appropriate to a particular product would be impossible to administer, and the second next to impossible. Figures on aggregate dollar profits for separate products of multiple-product industries are probably unprocurable; information on the investment separately allocable to such products is certainly so. The data on percentage or dollar margins of profit of representative firms necessary to apply the second measure, on the other hand, cannot be said to be unobtainable. Such a standard, however, would compel the Office of Price Administration to make literally thousands of studies of the historical and current costs and profits allocable to particular products. In the course of these studies it would be required to reexamine and reconcile the cost and profits data of different firms which are based upon different accounting practices and to resolve the most difficult problems of accounting theory. It is true that the existing product standard compels a substantial number of cost studies for separate products. For the precise reason that this standard is a minimal one, however, relatively few products ceilings are challengeable under it. A product standard based upon an actual historical profit for each product of each industry would open up to question a vastly greater number of ceilings. The Office of Price Administration does not have and cannot hope to employ a staff large enough to make such studies. Price control would break down under the burden of trying to make them.
"The second of the two suggested measures of profit for particular products would be intrinsically inflationary. If based upon a percentage margin of profit it would result in the pyramiding of prices and costs as the general price level rose. Whether based upon a percentage or dollar margin of profit, it would compel disregard of aggregate dollar earnings. Thus, in many instances it would require a price increase on a particular product, as a minimum obligation of law, even though an increase in volume, such as is characteristic of wartime conditions, had resulted in unprecedented industry earnings on that very product.
"A legal guaranty of an actual historical profit for each product, however measured, would be inflationary for still another and even more important reason. It would place the law of averages on the side of price increases. So doing, it would necessarily result in the establishment of prices at abnormal levels. As a matter of policy, the Administrator always attempts, so far as practicable, to secure normal price relationships between products and normal or historical margins of profit upon them. The product standard, however, measures not the ideal to be sought but the minimum which must be attained. In practice the Administrator's goal can never be achieved with exactness. Data are at best incomplete. Changes in conditions affecting costs and profits are incompletely foreseeable. It is inevitable, therefore, when the effort is made to assure historical profits on each product, that many products will actually return abnormal profits while others will return profits which are less than normal. The Administrator, to be sure, has power to reduce those prices which prove excessive. But this is a costly and time-consuming process, subject to severe practical limitations. Most of the prices which prove to be too high, therefore, will in practice remain so. Under the suggested standard, however, all the prices on which profits fell below the goal sought would have, as a matter of law, to be increased. The mathematical consequences of such a policy in multiple-product industries would be that the general level of both prices and earnings would be abnormally high.
*366 "A view of the practical effect of a product standard which attempted to guarantee some stated measure of profit on each product, if it were now adopted, confirms the foregoing considerations. The immediate effect would be to require a large number of price increases. These would not be confined to industries in a relatively less favorable position. They would be widely distributed also among the relatively most prosperous industries. They would go to swell indiscriminately business earnings which, taken as a whole, are currently, even after taxes, at the highest levels in American history. To permit a multitude of such indiscriminate price increases for no other reason than that the earnings on the particular products  regarded separately  are below some historical measure would be self-evidently unwarranted and inflationary. It is seriously to be doubted whether the stabilization structure could absorb the shock of them.
"The existing product standard, taken together with the industry earnings standard, proceeds on the premise that it is broadly fair to balance the less favorable prices in an industry against more favorable ones, so long as extreme variations from the normal are prevented and so long as the over-all earnings of the industry equal or better peacetime earnings. Any other standard for particular products would be impracticable to administer and, even if practicable, would lead to unwarranted price increases which in the aggregate would be disastrous to the economy."
We think that Congress fully understood and approved the use by the Administrator of the industry earnings and product pricing standards when it extended the Emergency Price Control Act by the enactment of the Stabilization Extension Act of 1944. The use by the Administrator of these standards in the consideration of applications for price increases and the reasons for their use were clearly and forcefully disclosed to both Houses of Congress in connection with the consideration of that act. Not only was the memorandum from which we have quoted before the Committees on Banking and Currency of both Houses but the subject was discussed at the hearings held by the Committees,[8] in the report of the Senate Committee[9] and in the debates.[10] Congress nevertheless continued without any modification the statutory standard  "generally fair and equitable"  which had been thus interpreted by the Administrator.
The legislative history provides even more convincing evidence of the Congressional understanding. The so-called Bankhead cotton amendment to the Stabilization Extension Act as adopted by the Senate expressly provided that the maximum prices for any textile product processed or manufactured in whole or substantial part from cotton yarn should include for each specific textile item a reasonable profit on such item in addition to the costs of materials and processing or manufacturing.[11] This requirement for a profit on each specific item was recognized as a departure from the standards applicable under the act to commodities generally. See in this connection the views of the minority of the Senate Committee which opposed the amendment.[12] In the Stabilization Extension Act as finally enacted the Bankhead Amendment was modified to read in part here material as follows:
"On and after the date of the enactment of this paragraph, it shall be unlawful to establish, or maintain, any maximum price for any agricultural commodity or any commodity processed or manufactured in whole or substantial part from any agricultural commodity which will reflect to the producers of such agricultural commodity a price below the highest applicable price standard (applied separately to each major item in the case of products made in whole or major part from cotton or cotton yarn) of this Act."[13]
It will be seen that there is in this provision a clear direction by Congress that in the case of cotton textile commodities *367 the price standards of the act are to be applied separately to individual commodity items, although even here they are only to be so applied to the major items. The fact that Congress thought it necessary to incorporate this provision in the act shows that it recognized that the act does not otherwise require that its standards shall under all circumstances be applied separately to each individual commodity item. Likewise the fact that this provision was restricted to major textile items can only mean that Congress approved the application to all other commodity items of the pricing standards which the Administrator had adopted in the administration of the act.
We conclude that the use by the Administrator of the industry earnings standard in conjunction with the product standard to determine whether a maximum price previously set by him is no longer generally fair and equitable and such as will effectuate the purposes of the Emergency Price Control Act is a reasonable exercise of the discretion conferred upon him in the administration of the act and is in consonance with its mandate. It follows that the present complainants, who sought to have the maximum prices of bleached shellac modified upon the ground that they were no longer fair and equitable, had the burden of showing the facts from which the Administrator in the light of the industry earnings and product standards could find that these prices had ceased to conform to the statutory standard.
We accordingly pass to the question whether the Administrator was right in denying the complainants' protests upon the ground that they had failed to offer sufficient evidence to enable him to find that, as measured by the industry earnings and product standards, the maximum prices protested against were no longer generally fair and equitable. In considering this question it must be remembered that the burden is upon a protestant to offer evidence sufficient to overcome the presumption of validity which attends the Administrator's regulations and orders. Montgomery Ward & Co. v. Bowles, Em.App.1943, 138 F.2d 669. In the present case we may put to one side the question whether a complainant who represents but one unit in an industry has the burden of proving the costs and profits of his competitors in the industry as well as his own or whether he may make out a prima facie case by merely offering his own data and proving that his operations are substantially representative of the industry and are not in its high cost marginal fringe. Here the complainants concededly comprise the major portion of the industry and may, therefore, by the mere production of data from their own records make a prima facie showing for the industry.
In support of their protests the complainants relied upon an increase in the cost of the raw materials from which they manufacture bleached shellac and in manufacturing, selling and administrative costs and the consequent reduction in the margin of profit realized thereon which they said resulted from that increase. They did not offer evidence as to their manufacturing, selling or administrative costs, however, or as to their over-all net earnings either for the prewar period 1936-1939 or for the most recent wartime period. The Administrator thereupon entered an order in which he stated that he deemed the evidence submitted by the complainants with their protests to be insufficient for the determination of the issues raised thereby and that additional information was necessary. Accordingly by the order he afforded the complainants an opportunity to present additional evidence with regard to the quantity of production, manufacturing costs and receipts from the sale of bleached shellac in November and December, 1941, and in September and October, 1943, and as to the profit and loss statements of each complainant for the years 1936 to the first half of 1943, inclusive.
Pursuant to this order the complainants offered much additional data from the books and records of Gillespie-Rogers-Pyatt Co., Inc., which was the only one of the complainants then engaged in manufacturing operations and which was carrying on these operations for the account of the entire industry. The complainants, however, failed to produce any evidence as to the net earnings of Gillespie-Rogers-Pyatt Co., Inc., or any other members of the industry for either the prewar years 1936 to 1939 or the years 1941 to 1943. Counsel for the complainants in a letter to the Office of Price Administration transmitting certain of the evidence which was furnished, stated:
"I respectfully contend that the facts set forth in the Protests and Petitions and in *368 the affidavits supporting the same clearly establish that the Protestants and Petitioners are entitled to the requested relief and the question of what their costs or profits were in the prior years referred to in the November 17th, 1943 Order has no bearing on the matter."
It thus appears that although the data must have been available in their books and records the complainants failed to comply with the request of the Administrator to offer in evidence their profit and loss statements for the years mentioned. Thereby they made it impossible for the Administrator to test the merits of their protests by the use of the industry earnings standard. The complainants did offer evidence as to the result of the operations of the bleach department of Gillespie-Rogers-Pyatt Co., Inc., for the years 1936 to October 31, 1943, inclusive. But these figures do not show, even for the most recent period, an out-of-pocket manufacturing loss which under the application of the product standard would call for a price increase regardless of the over-all earnings of the industry.
It is true that the complainants' evidence does show a reduction in the gross profit on bleached shellac which might call for an increase in the maximum price of that product under the industry earnings standard if the industry has in fact suffered a substantial decrease in its over-all earnings as compared with those of the prewar period. But since the complainants declined to offer evidence as to their over-all earnings for either period they failed to provide the Administrator with the necessary basis for determining, by the application of the industry earnings and product standards, whether the maximum prices for bleached shellac had ceased to be generally fair and equitable. They failed to exclude the possibility that reduced profits on bleached shellac had been offset by increased profits in other departments of the industry.
The complainants urge that it has not been shown that theirs is a multiple-product industry. Therefore, they say, the industry earnings standard is not applicable to them. We think that this contention is without merit. In the first place industry earnings would be relevant even if the complainants were in a single-product industry for in that case the industry earnings would represent nothing more than the profits realized on bleached shellac. But we think that, while the evidence in the record on the point is perhaps meager there is sufficient to support the inference that the complainants are engaged in a multiple-product industry. The fact that the figures which they did offer in evidence were the profit and loss figures of the "Bleach Department" rather than the over-all profit and loss figures indicates quite clearly that the industry had other departments and that the profit and loss figures for the Bleach Department were not the same as those for the entire business. It may well be true, as suggested by the complainants, that their industry has been much restricted by the war and that they have perforce been compelled to drop a number of products which they formerly carried. Counsel for complainants conceded at bar, however, that they still do deal in orange shellac as well as the bleached shellac which is involved in this case.
We conclude that the Administrator rightly held that the complainants had failed to present in support of their protests evidence of facts relating to their own business which it was incumbent upon them to prove before the Administrator could determine that the maximum prices for bleached shellac were no longer fair and equitable. It necessarily follows that the order of the Administrator denying the protests was neither arbitrary nor capricious. Fearing, however, that the complainants may have misunderstood the Administrator's order inviting the submission of additional evidence we asked counsel for the complainants at the hearing of this case whether they desired leave at this time to introduce as additional evidence the profit and loss statements which the Administrator had requested but which had not been offered in the protest proceedings. However, counsel stated at bar that the complainants did not wish to offer additional evidence at this time but elected to stand on the record as it appears in the transcript certified by the Administrator.
Accordingly, a judgment will be entered dismissing the complaint.
NOTES
[1] 7 F.R. 8556.
[2] 50 U.S.C.A.Appendix, § 901 et seq.
[3] 50 U.S.C.A.Appendix, § 961 et seq.
[4] Senate Rep. 922, 78th Cong.2d Sess., pp. 45, 47.
[5] Act of June 30, 1944, Pub. No. 383, 78th Cong., 58 Stat. 632, 50 U.S.C.A.Appendix, § 901 et seq., § 961 et seq.
[6] Senate Hearings on S. 1764, 78th Cong. 2d Sess., pp. 1410, 1411.
[7] House Hearings on H. R. 4376, 78th Cong. 2d Sess., pp. 1990, 1991.
[8] See testimony of James F. Brownlee, Deputy Administrator for Price. Senate Hearings on S. 1764, 78th Cong. 2d Sess., pp. 77-96. House Hearings on H. R. 4376, 78th Cong., 2d Sess., pp. 55-62.
[9] See Senate Report 922, 78th Cong., 2d Sess., Supplemental Statement, pp. 45, 47.
[10] See especially remarks of Senator Robert A. Taft on June 9, 1944, 90 Cong. Rec. pp. 5683-5686.
[11] Sec. 201 of S. 1764 as passed by the Senate June 9, 1944.
[12] Sen. Report 922, 78th Cong. 2d Sess., pp. 24, 25.
[13] Sec. 201(b) of the Stabilization Extension Act of 1944 amending Sec. 3 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 963(b).