MODERN MFG. CO., Inc., v. FLEMING, Temporary Controls Administrator.

No. 254.

United States Emergency Court of Appeals.

Heard at New York City Oct. 23, 1945, and Nov. 1, 1946.

Decided April 1, 1947.

Rehearing Denied April 30, 1947.

Writ of Certiorari Denied June 16, 1947. See 67 S.Ct. 1742.

Aaron L. Danzig, of New York City (Nemeroff, Jelline, Danzig & Paley, of New York City, on the brief), for complainant.

William R. Ming, Jr., Chief, Court Review Price Branch, of O.P.A., of Washington, D. C. (Richard H. Field, Gen. Counsel, Carl A. Auerbach, Associate Gen. Counsel, and Samuel M. Singer, Atty., all of O.P.A., all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

In this case the complainant challenges the validity of certain provisions of price regulations applicable to sales by manufacturers of women's and misses' dresses, with particular reliance upon our decision in Montgomery Ward & Co., Inc. v. Bowles, Em.App., 1945, 147 F.2d 858.

On May 11, 1942, maximum prices for women's, girls', children's and toddlers' outer wear garments were established by § 1499.2(a) of the General Maximum Price Regulation, which froze each seller's prices at the highest price charged by him for the same or similar article in March, 1942 (7 F.R. 3153). This method of control was soon found to be inadequate because of the primary emphasis upon style and fashion in the feminine apparel industry and the production of a great many unstandardized items. Consequently the Price Administrator issued Maximum Price Regulation No. 153, effective May 29, 1942, to cover the pricing of feminine outerwear garments for the fall and winter season of 1942 (7 F.R. 3901).

MPR 153 expired in December of 1942. It was therefore necessary for the Price Administrator to issue a new regulation for the spring and summer selling season of 1943. To that end, he issued Maximum Price Regulation No. 287, which became effective December 15, 1942 (7 F.R. 10460). Revised Maximum Price Regulation No. 287, effective on June 29, 1943 (8 F.R. 9122), provided pricing rules for fall and winter sales, and incorporated by reference the rules governing spring and summer sales contained in MPR 287—thus providing year-round maximum prices applicable to the manufacturers of feminine outerwear garments.

In both MPR 287 and RMPR 287, the method of control was in terms of restrictions placed upon selling price lines and margins. The regulations were written so as to accord with the practices prevailing in the industry. Manufacturers of feminine clothing historically have concentrated their efforts on the production of a small number of well-recognized selling price lines, such as those of dresses of $2.25, $3.75, $4.75, etc. Each selling price line may contain any number of styles of garments varying in design, quality of material, trimmings, and other particulars.

MPR 287 and RMPR 287 separated feminine outerwear garments into designated categories—for example, women's blouses, girls' suits, and misses' dresses. The regulations prohibited a manufacturer from selling or delivering during a given selling season garments in a specified category at a price line higher than that established in that category during a base period provided for the particular selling season. In order to establish a selling price line in a given category, the manufacturer was required to show that during the applicable base period he offered to his general trade one style of garment in that category and in that price line, and that he actually delivered one such garment prior to the close of the base period. If one style of garment met these requirements, then the selling price line was established for that category and thereafter any number of styles might be sold at that price line, provided each garment in each style met the minimum cost requirements as outlined below.

Since the determination of the manufacturer's selling price lines would in effect determine the ceiling prices, the remaining aim of the regulation was to insure that a minimum value of direct labor costs, material, and trimmings would be included in all garments sold at a given price. It is sufficient for the purposes of this proceeding to state in general terms that the pricing rules were designed to determine, by the use of base figures, the "maximum allowable margin" that a manufacturer might properly allow himself. The balance was the "minimum allowable cost" which each garment must contain.

With that introduction we turn to the facts of this case. For over twenty-five years the complainant has been a manufacturer in New York City of women's and misses' dresses in the lower price lines ranging upward from $16 per dozen. During the year 1940 the complainant sold 348 dozen dresses in the $30 per dozen price line out of 54,634 dozen total sales. Throughout 1941, the firm did not handle the $30 per dozen price line, but some time in December of 1941 it produced six or more

sample dresses which were designed to be sold in the $31.50 and $33 per dozen price lines. Among these sample styles were the ones eventually sold under the numbers 875, 876 and 877. In accordance with a general practice in the industry of obtaining orders in advance of commencing actual production, the complainant through its salesmen and showrooms took a considerable number of orders for these three styles during March of 1942. The cutting record of the complainant shows that all three styles were ordered cut in the first part of April and actual cutting commenced before the middle of the month. The first delivery of any of these three styles was on April 30, 1942, and thereafter a considerable number of deliveries took place.

In March of 1945, an enforcement action was filed by the Price Administrator against complainant in the United States District Court for the Southern District of New York alleging violations of the highest price line provisions of the regulation during the period March 1 to December 1, 1944. The enforcement action has now been marked "settled" and a consent judgment entered, the effect of which depends upon the decision of this court in the instant proceeding.

On April 18, 1945, complainant filed a protest with the Price Administrator attacking § 10, Rule 2, and § 15(a) of RMPR 287, and § 1389.353(c) of MPR 287.[1] The protest was denied by the Price Administrator on July 16, 1945, and on August 9, 1945 the pending complaint was filed in this court. At the first oral argument of the case on October 23, 1945, we granted complainant permission to file an application for leave to introduce additional evidence relating to its contention that it was actually engaged in the business of selling dresses during March, 1942, in price lines in excess of $24.00 per dozen, which the Price Administrator claimed was complainant's highest price line under the regulation. On November 9, 1945, we granted such application and ordered the additional evidence to be presented to the Price Administrator, together with such other evidence as the Price Administrator might deem it necessary or proper to receive. After the Price Administrator had incorporated certain material into the record and the complainant had submitted rebuttal evidence, the protest was denied upon reconsideration on March 29, 1946. On May 16, 1946, we granted a second application by complainant for leave to introduce additional evidence, whereupon the Price Administrator again reopened the protest proceeding and on July 30, 1946, upon further reconsideration, the protest was again denied.

■ Before discussing the main point relied upon by the complainant, we will dispose of an argument pressed less strongly, namely, that the highest price line limitation was not price control within the Price Administrator's delegated power. We held to the contrary in Montgomery Ward & Co., Inc. v. Bowles, Em.App., 1945, 147 F.2d 858, a decision to which we adhere. Significantly, subsection (k) of § 2, added to the Emergency Price Control Act by the Stabilization Extension Act of 1944, 50 U.S.C.A. Appendix, § 902(k), forbade the imposition of highest price line limitations at the retail level, but did not invalidate such limitations at producer or wholesale levels.

---

[1] "Sec. 10. * * *

"(b) Rule 2: Sales at selling price lines different from those listed on the pricing chart. A manufacturer may, at his option, sell a garment in a selling price line different from those listed on his pricing chart: Provided, The garment contains the minimum allowable cost for the selling price line: And provided also, That the selling price line is not higher than the highest selling price line listed on his pricing chart in effect on the date of delivery for a garment of the same category number. * * * *"

"Sec. 15. Prohibition. On and after June 29, 1943, regardless of any contract or other obligation:

"(a) No manufacturer shall deliver any garments in a selling price line higher than the highest selling price line listed for a garment of the same category number on his pricing chart in effect on the date of delivery."

"§ 1389.353. * * *

"(c) 'Pricing Rules.' A manufacturer may not sell any garments in a selling price line different from the selling price lines at which he delivered garments of the same category number during March 1942, except that he may sell garments in a lower selling price line than the lowest selling price line at which he delivered garments of the same category number during March 1942."

We come next to complainant's principal objection.

Section 1389.353(b)(1) of MPR 287 defined a selling price line as follows:

" 'Selling price line' means the price at which a manufacturer first offered for sale to his general trade a style of garment on the occasion of its first cutting. Subsequent offers to sell, or sales of the same style, at higher or lower prices, are not to be considered as establishing separate selling price lines. Selling prices which differ from the prices customarily established for the general trade, because of discounts, allowances, or price differentials for different classes of purchasers, do not constitute selling price lines. Sample sales or accommodation sales shall not be considered as establishing a selling price line."

This definition must be read in conjunction with § 1389.353(a) of MPR 287, which provided in part:

"Before selling or delivering any garment priced under this regulation, the manufacturer must prepare a pricing chart containing: * * * (2) A list of each of the 'selling price lines' delivered during March 1942, in each category number."

Section 15(a) of RMPR 287, which is quoted in footnote 1, supra, prohibited a manufacturer from selling garments in a price line higher than the highest price line for that category on his pricing chart in effect on the date of delivery.

Thus the regulation required any manufacturer who desired to establish a given price line for the spring and summer selling season to show that a garment of that category was offered to the general trade at that price line, and also that there was a delivery of a single garment in that price line prior to the end of March, 1942.

The complainant contends that the requirement of a delivery of a single garment prior to the end of March, 1942 in order to establish a given price line, is unreasonable and discriminatory and should be held invalid upon the authority and reasoning of Montgomery Ward & Co., Inc. v. Bowles, supra.

We think this case is not controlled by Montgomery Ward & Co., Inc. v. Bowles. In that case Maximum Price Regulation No. 330 was under attack, a regulation which required that a retailer, who wished to establish a price line, had to show one delivery of an article in that price line during the month of March, 1942. This court held such a requirement invalid because it resulted in discrimination, brought about by what may have been a turn of the wheel of chance and not by reason of any scientific approach to price control, since it might deny a retailer the right to make future sales of garments in price lines he was actually engaged in selling and had on his shelves in March, 1942. There was evidence in the record indicating the likelihood that a good number of retail stores would be prevented by the regulation from using a higher price line than they were actually engaged in selling during March, 1942, because of the fortuitous lack of a single delivery during that month of an item in that particular line. As we pointed out (Em.App., 147 F.2d at page 864): "Failure of a merchant to deliver in March 1942 from his highest price line might have occurred because of weather conditions in his location; because the style of garments which he handled in his highest price line during that month chanced not to meet with favor; because he was temporarily out of stock in his highest price line; because of inadequate advertisements or displays; or any number of other misfortunes."

By contrast, the regulation presently under consideration applied only to sales by manufacturers. The purpose of the highest price line limitation was to minimize the inflationary effect caused by shortage of low priced garments which in part resulted from a tendency by manufacturers to shift their production from lower to higher price lines, where more profit was to be derived per garment. The entire scheme of the regulation was designed to confine manufacturers to their established price lines. The Price Administrator was obliged to formulate a technique for separating the manufacturers who had historically produced goods in the highest price lines from those who had recently moved into that field under the impetus of an inflationary market. It is hardly to be supposed, and the record con-

tains no indication, that a manufacturer who was actually engaged in selling a higher price line prior to March 31, 1942, would have been likely to fail to deliver at least one garment in such line before the end of that month. In fact, in the clothing manufacturing industry, March is historically one of the peak months, if not the peak month, for the sale of spring and summer styles. The fortuitous circumstances which we referred to in the Montgomery Ward case as likely to affect retail sales are not operative at the manufacturing level. Manufacturers customarily specialize in a fewer number of price lines than do retailers. They get their orders prior to putting the goods in production, whereas retailers fill their stock rooms and await customers' orders.

It is true that the price line limitation might have operated to deny the future use of a price line to a manufacturer who had taken steps to break into a higher price line during the latter part of 1941 and the first part of 1942, but who had not progressed to the point of having made a delivery in the higher price line by the end of March, 1942. But it is inherent in the type of regulatory provision now in question that a line had to be drawn somewhere, and we cannot say that the line which the Price Administrator drew was arbitrary or capricious, in view of the foregoing. Since the practice of the industry is to postpone actual production until enough sales have been booked to assure the success of the particular style, it cannot be said that complainant was actually engaged in selling dresses in the $31.50 and $33.00 per dozen price lines, or, in other words, had established itself in such higher price lines by the end of March, 1942, when in fact neither the first cutting nor the initial deliveries of styles numbered 875, 876 and 877 in those price lines occurred until after March 31, 1942. Mere offers to sell in a particular price line or the receipt of some orders without committing the goods to production prior to the end of March, 1942, is not sufficient to demonstrate that complainant was established in that price line during the base period.

■ Some point was made as to the different treatment accorded in MPR 287 to new manufacturers who entered the field in the period April 1, 1942, to December 1, 1942. Such manufacturers presented a special problem, and of course they had had no March, 1942, experience. Without discussing the argument in detail, we state our conclusion that the classification was based upon a substantial factual difference, and that the method chosen by the Price Administrator for regulating the prices of this special class of interim manufacturers cannot be said to have been lacking in a rational basis or to have constituted an arbitrary discrimination as against established manufacturers.

■ It was also objected that the regulation on its face was not generally fair and equitable in that it prevented manufacturers from passing on increases in costs which had occurred since the base period. No evidence was adduced to show the extent of such increases or their effect upon the earnings of the industry as compared with the level of industry earnings during a representative period prior to price control. In this state of the record we cannot find that the established maximum prices during the period now in question were not generally fair and equitable. See Gillespie-Rogers-Pyatt Co., Inc. v. Bowles, Em. App., 1944, 144 F.2d 361.

■ Finally, the argument is made that the regulation interfered with an established business practice of the industry contrary to § 2(h) of the Act, in that it was customary in the industry to price certain garments higher and other garments lower than a previously determined average markup over costs, whereas the regulation allowed only an average markup for all articles in a given price line. In answer to this argument we refer to Philadelphia Coke Co. v. Bowles, Em.App., 1943, 139 F.2d 349, 357, where we said:

"It may be conceded that in a broad sense this is a business practice but we are clear that it is not a business practice within the meaning of Section 2(h) of the act. On the contrary it is what may fairly be described as a pricing practice and is, therefore, unquestionably within the regulatory power of the Administrator. It would wholly destroy the effectiveness of the act if Section 2(h) were to be con-

strued as placing it beyond the power of the Administrator to deal with established business practices which directly affect the fixing of the prices of commodities. It is obvious that any control of prices will directly interfere with those business practices which relate to the fixing of prices. It was only to make sure that the Administrator would not go beyond his price regulating function and engage in an effort to reform business practices which were not directly related to prices that Section 2(h) was inserted in the act."

A judgment will be entered dismissing the complaint.

