**ALLIED FOODS et al. v. BOWLES,**
**Price Administrator.**

**No. 199.**

United States Emergency Court of Appeals.
Heard at Los Angeles, Cal., June 4, 1945.

Decided Oct. 25, 1945.

Abraham Gottfried, of Los Angeles, Cal., for complainants.

John O. Honnold, Jr., Sp. Asst. to Associate Gen. Counsel, and Benjamin Freidson, Atty., both of Office of Price Administration, both of Washington, D. C. (Richard H. Field, Gen. Counsel, and Nathaniel L. Nathanson, Associate Gen. Counsel, both of Office of Price Administration, both of Washington, D. C., on the brief) for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

This case involves the Regulation issued by the Price Administrator, affecting the processing of pickles, and in this particular instance has to do with cucumbers so processed.

Maximum Price Regulation No. 488—Pickles and Certain Pickled Products, which superseded price ceilings formerly existing under the General Maximum Price Regulation, established maximum prices for sales of pickles and pickled products, by all persons except wholesalers and retailers. Fresh cucumber pickles were excepted from the Regulation.

Sellers of pickles and pickled products come under various categories of the Regulation,—farmers, selling fresh cucumbers; sellers of cucumbers which have been fully or partially cured by treatment with salt brine, but which are not yet ready for human consumption; and sellers of processed pickles, which have been converted to the finished product, packed and ready for human consumption. Pickles which are fully or partially cured by treatment with salt brine, but which are not yet ready for human consumption, are designated as "salt stock." Those who convert fresh cucumbers, or "raw stock," into salt stock are defined as salters or briners. Those who convert salt stock into the finished product are defined as final processors.

In this case, complainants are salters and briners, as well as final processors. They complain that the maximum prices established by the Regulation are not generally fair and equitable, as required by Section 2 of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 902, in that such prices fail to reflect increased costs of raw materials that have occurred since the issuance of the Regulation. They further assert that such maximum prices fail to reflect parity to the producers of the agricultural commodities in question, as required by Section 3 of the Stabilization Act of 1942, as amended, 50 U.S.C.A.Appendix, § 963.

In support of their claims, complainants rely upon the statement of considerations accompanying the issuance of Maximum Price Regulation No. 488, as well as upon the admitted change in the price of the raw product, and the increase in the parity price of raw cucumbers, which has occurred subsequent to the issuance of the Regulation.

In the statement of considerations, accompanying the issuance of the Regulation in question, the Administrator was primarily concerned with two requirements—first, that, as required by Section 3 of the Stabilization Act of 1942, as amended, the prices established by the Regulation, reflect parity to the producers of the raw cucumbers from which the pickle products were manufactured or the highest price received by such producers for such commodities between January 1, 1942 and September 15, 1942, whichever was higher; and second, that, as required by Section 2 of the Emergency Price Control Act, such maximum prices be generally fair and equitable.

With regard to the requirement that the maximum prices established by Maximum Price Regulation No. 488 reflect the higher of parity or the actual 1942 price, the Administrator in his statement of considerations set forth: (1) That the price of raw cucumbers between January 1 and September 15, 1942, was 80 cents per bushel; (2) that the prevailing price of such product, on November 2, 1943 (the date of issuance of the Regulation in question), was $1.05 per bushel; (3) that the United States Department of Agriculture had determined that the parity price for raw cucumbers on November 2, 1943, was $1.05,

per bushel; (4) that on November 2, 1943, the increase in the cost of raw cucumbers, since 1942, to salters and briners, amounted to 25 cents per bushel, and that such salters and briners were accordingly permitted to add this amount to their former selling price; (5) that on November 2, 1943, final processors were faced with identical increases in the cost of their raw materials, and were accordingly allowed to increase their former maximum prices by 5%. This latter increase was permitted on the ground that, inasmuch as the raw material cost is 14% of the selling price for the final processors, an increase of 25 cents per bushel (which was allowed to the salters and briners) would be equivalent to a 4½% increase in the cost which the final processors would be obliged to pay for salt stock. Therefore, a mark-up of 4½% over the former prices at which the final processors sold, would exactly compensate them for the increased price of 25 cents per bushel allowed to the salters and briners. The additional ½% allowed—to bring the permitted increase to final processors to 5%—was permitted to take care of the increase in cost of cooperage and possible increase in parity. It apparently was assumed that unless the increases were granted, the growers would not receive parity.

As to the requirement that the maximum prices be generally fair and equitable, the Administrator in his statement of considerations recited that: "As a result of consultation with the industry and from figures submitted by the industry, it has been determined that the average profit for the past three years was about 4% of the selling price. As pointed out above, the increased cost of raw cucumbers amounts to about 4½% of the final selling price of the finished product. * * * In the judgment of Price Administrator, an increase of 5% to final processors of pickles is necessary in order to restore that industry to approximately a normal peace-time level of profits. It is his opinion therefore that the prices established by this Regulation are generally fair and equitable, and allow a fair margin for processing, and that the price increases granted are not beyond the minimum extent required by law."

In considering whether the prices established by the Regulation reflect parity, it should be remarked that the parity price for raw cucumbers has increased from $1.05 per bushel on November 2, 1943—when the Regulation was issued—to $1.08 per bushel as of the date when the Administrator's answer to the complaint was filed and the hearing before him in this case.

It is claimed that the prices fixed in the Regulation failed to reflect parity to the grower, as required by Section 3 of the Act. Parity, in this case, is defined by statute as the price which will give to the commodity—in this case, cucumbers—a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of such commodity in a designated base period.[1] "The requirement of reflection," as explained by Senator Wagner, Chairman of the Senate Committee on Banking and Currency, to the Senate, on behalf of the Senate conferees for the Price Control Bill, "means that the price of the processed commodity must be such that it will not prevent the price of the basic agricultural commodity from reaching the applicable statutory standard for a maximum price on that commodity."[2] In this case, the applicable statutory standard in respect to cucumbers, the basic agricultural commodity from which pickles are processed, is the parity price.[3]

The parity price of cucumbers as of the date of hearing before the Administrator, was admitted to be $1.08. Complainants' evidence was to the effect that the current cost of the raw material in question was far in excess of the parity price of $1.08 per bushel, and that it ranged from $1.1375 per bushel in 1943 to $1.333 per bushel in 1944.

We find no evidence that the maximum prices established by Maximum Price Regulation No. 488 failed to reflect the parity price to the grower of cucumbers. On the contrary, under those prices, as established for salters, briners and final processors, the grower is receiving much more than the parity price for his commodity. How or why the growers receive such high prices is not explained or disclosed. It may be that the processors, because of factors of competition or scarcity of product, are forced to pay such high prices in order to remain in business, even though they may

---

[1] Title 7 U.S.C.A. § 1301(a) (1) (1944 Supp.)

[2] 90 Cong.Rec., page 6452 (June 21, 1944).

[3] See Sec. 3 of the Stabilization Act of 1942, as amended, 56 Stat. 765, 50 U.S.C.Appendix, §§ 961–971.

be presently or temporarily conducting such businesses at a loss.

Complainants, however, seem to have assumed that the statute, in providing that the maximum prices for commodities processed or manufactured in whole or in part from agricultural commodities should reflect to the producers the parity price, means that they should reflect the parity price to the producers, and also include a fair price or profit for the processor. Complainants may have been led into this supposition by the recital in the statement of considerations here involved that the Administrator was increasing the final processors' prices "to take care of * * * any possible increase in parity"; or their misapprehension may have resulted from the fact that, in permitting price increases to salters, briners, and final processors in Maximum Price Regulation No. 488, the Administrator based his allowance thereof on the increase that had taken place in the parity price of cucumbers. For it was considered when the parity provisions were written into the Stabilization Act that the prices which would be permitted to processors and retailers of commodities, might well determine the prices received by growers or producers of such commodities; and it was determined that the government should not arbitrarily fix a ceiling that would not permit the farmer to receive the parity price for his products.[4] But in a market where demand greatly exceeds supply, and where prices charged by processors and retailers are limited to fixed ceilings, while prices charged by the growers are not subjected to such price control, it does not always result that the processors' or retailers' prices determine the prices which the growers receive. Here, in spite of ceilings over prices charged by processors, which were established specifically in order to insure the receipt only of parity prices to the growers, the prices actually received by the growers seem to have increased, in excess of the parity price from year to year. Pursuit of the explanation for this apparently anomalous situation would lead from the path of law to adventures in the tangled fastnesses of economic speculation. But with this we are not concerned.

■ In so far as applicable to this case, the statutory provision of Section 3 of the Stabilization Act only provides that the maximum price shall not be below a price that will reflect parity to the producers. It does not require that with the increase of parity—that is, the minimum price to be received by the producers—there should be permitted corresponding increase in price to the processors. And where, as here, the producers receive the parity price—and much more than parity—there is no obligation upon the Administrator, under Section 3 of the Act, to increase the price allowed to final processors. True, with the increase of the parity price, such processors may have to pay much more for their raw stock,—may, in fact, have to pay so much that their profit is completely wiped out. But Section 3 of the Act is not concerned with salters, briners, or processors, but only with the growers of the commodity. If the latter receive parity, there is no requirement under Section 3 that the Administrator concern himself with the prices received by the processors. If they suffer injury, and have any remedy, it may be under some other section of the Statute. Complainants have failed to sustain their contentions under Section 3 of the Stabilization Act.

We come, then, to complainants' contention that the Price Regulation in question is invalid under Section 2 of the Emergency Price Control Act for the reason that it is not generally fair and equitable, in that the maximum prices therein provided fail to reflect the increased cost of raw materials by way of equivalent increases in maximum prices.

■ It is, of course, unnecessary to the validity of a regulation that all cost increases be offset by corresponding price increases. Philadelphia Coke Company v. Bowles, Em.App.1943, 139 F.2d 349; Gillespie-Rogers-Pyatt Co., Inc., et al. v. Bowles, Em. App.1944, 144 F.2d 361; Chatlos v. Brown, Em.App.1943, 136 F.2d 490; Lakemore Co. v. Brown, Em.App.1943, 137 F.2d 355; Interwoven Stocking Co. v. Bowles, Em.App. 1944, 141 F.2d 696. In this case, complainants have failed to present evidence of the experience of the industry under price control, as compared with peacetime operations, and the Administrator contends, inasmuch as the general fairness and equity of a maximum price regulation must be tested in the light of a comparison of the over-all earnings of the industry with its earnings in a representative peacetime pe-

---

[4] See explanation of Chairman Steagall, of the House Banking and Currency Committee in charge of the Emergency Price Control Act, during House debates. 88 Cong.Rec. 7521 (Sept. 22, 1942).

riod, that, therefore, complainants have failed to sustain the burden of proving their case. Gillespie-Rogers-Pyatt Co., Inc., et al. v. Bowles, supra. Complainants, however, have sought to explain their failure to present such evidence on the ground that they have not the necessary statistical gathering facilities to do so; that such a task is for them a physical impossibility; and that large competitors will not join them or open their books to aid them in such proof inasmuch as these prefer to operate at a loss for a considerable time in the hope that the effects of the Regulation will be to drive their smaller competitors out of business.

█ Under the special circumstances of this case, we are of the opinion that it is not necessary for complainants to prove and compare the over-all earnings of the industry with its earnings in a representative peacetime period, in order to show that the maximum prices fixed in the Regulation are not generally fair and equitable. For complainants have relied in proof of their case upon the Administrator's statement of the considerations accompanying the issuance of the Regulation; and it is our conclusion that his findings as therein proclaimed are sufficient to establish that the maximum prices applied to complainants' products as of the date of protest and hearing before the Administrator were not generally fair and equitable. In this regard, it is pertinent to consider the nature and importance of the "statements of considerations" which, by mandatory provision of the Act, are required to be issued by the Administrator whenever he issues a regulation affecting prices.

In Section 2(a) of the Emergency Price Control Act, 50 U.S.C.Appendix, §§ 901–946 it is provided that every regulation or order issued for the purpose of establishing maximum prices "shall be accompanied by a statement of the considerations involved in the issuance of such regulation or order." In its report on the first draft of the Emergency Price Control Bill (H. R. 5990), the Committee on Banking and Currency of the House of Representatives states: "All ceilings are to be established by regulation or order of the Administrator and each ceiling under this subsection is to be accompanied by a statement of the considerations involved in its establishment. This statement will afford those subject to a price ceiling an adequate opportunity to know the basis for its adoption and to formulate, in the form of protests * * * any objections which they may have to the price ceiling." [5] The report of the Senate Committee on Banking and Currency on the Emergency Price Control Act of 1942 sets forth that the statement of considerations underlying the Administrator's action serves "to expose to public scrutiny and criticism the grounds upon which the price * * * regulations are based. The Administrator, in order to retain public confidence and support, will thereby be required to identify the problems arising in connection with each price regulation and to indicate the reasons for his actions. * * * All maximum prices are to be established by regulation or order of the Administrator and each such regulation or order is to be accompanied by a statement of the considerations involved in its issuance. This statement will afford those subject to a maximum price regulation an adequate opportunity to know the basis for its adoption and therefore, intelligently to formulate, in the form of protests as provided in Section 203(a) of the bill, any objections which they may have to such regulation." [6]

In the hearings on the Act before the Senate Committee on Banking and Currency, the General Counsel of the Office of Price Administration in explaining the provisions of the proposed bill stated that review of price regulations was not review of quasi-judicial action, but of quasi-legislative action. In the course of his remarks, he stated: "These are regulations applicable to an entire industry, and what we have done here is to utilize a standard which the courts themselves have devised: That is, whether the action taken is in accordance with law or is arbitrary or capricious. Now, we have gone beyond that in order to get something like findings of fact in order to help those who operate under the Act. What we have done is to provide 'statements of considerations' at two points of time. First, at the time that the regulation is issued, and then a supplementary statement before judicial review is had. In this way all the facts, the full case can be presented to the court." [7]

---

[5] 77th Cong. 1st Sess.H.R.Rep. 1409, page 5.

[6] Senate Report No. 931, 77th Cong. 2d Sess., pages 7 and 15.

[7] Hearings before the Senate Committee on Banking and Currency on H.R. 5990, 77th Cong., 1st Sess., page 178 (Dec. 11, 1941).

In the brief on the legal aspects of the bill, which was submitted by the General Counsel of the Office of Price Administration and filed at the hearing, and printed in the foregoing Senate Report, it was stated:

"Price ceiling regulations, under the House committee bill are to be issued by the Administrator after full inquiry. Each regulation must be accompanied by a statement of the economic considerations justifying its issuance. This requirement insures responsible and considered action by the Administrator and gives notice to protestants of the essential basis of the Administrator's price action. Thus the protestant can direct his objection to the precise issues which determined original action and can shape his evidence and arguments into the most effective form. The issuance of a statement of consideration will, in fact, sharpen the issue in every stage of administrative reexamination." [8]

With these important purposes underlying the statutory provisions for the issuance of a statement of considerations and viewing them in the light of findings of fact by the Administrator, on which the Regulation is based, we come to the Administrator's statement of considerations in the issuance of Maximum Price Regulation No. 488. Therein, the Administrator recited that he had consulted with the industry, and on November 2, 1943, had determined from such consultation and from the figures submitted by the industry, that the average profit for the three years from November 1940 to November 1943 was 4% of the selling price. He further found that, as of the time of the issuance of the statement of considerations—November 2, 1943—the increased cost of raw cucumbers amounted to 4½% of the final selling price. In addition, he found that it was necessary to add to the additional cost so found, ½% of the final selling price to take care of the increase in cost of cooperage and any possible increase in parity. Parity—and the prevailing price—at that time was $1.05 per bushel to the growers. Furthermore, as a result of his consultation with the industry, the Administrator found that, while the industry was able to absorb the increase in raw material cost from 1941 to 1942, it could not absorb any further increases. This finding was emphasized by the statement in the "press release" which was issued in printed form on the same page as the official regulation and which was au-

thorized by the Administrator, to the following effect: "In the judgment of the OPA it is not possible to require the industry to absorb the increased cost of raw materials by new economies or by other means." The Administrator, accordingly, granted both salters and briners and final processors price increases which "will exactly compensate them for the increased cost"—except that he also further granted the additional ½% over the former selling price to the final processors to take care of increased cooperage cost and possible increase in parity. Finally, the Administrator found that the above mentioned increase to the final processors was necessary in order to restore that industry to a normal peacetime level of profits and that the prices so established were generally fair and equitable and not in excess of the amount limited by law.

In sum, then, the Administrator found as facts: (1) That in November, 1943, the prevailing price and the parity price were $1.05 per bushel to the grower; (2) That this price resulted in an increase in costs within one year, of 25 cents a bushel to salters and briners; (3) That there was no way for the salters and briners to absorb this increased cost or further increases; (4) That it was accordingly necessary to permit the salters and briners to add exactly that amount of the increased costs to their selling prices; (5) That it was necessary to pass this increased cost on to the final processors; (6) That the raw material costs amounted to 14% of the ultimate costs for final processors; (7) That in order to compensate the final processors for the increased costs of raw material, it was necessary to permit them a mark-up of 4½% over their former prices; (8) That an additional ½% mark-up was necessary for final processors to take care of increase in cost of cooperage and possible increase of parity; (9) That the 5% mark-up over their former price was necessary to final processors in order to insure a profit to them of 4% of the selling price; (10) That 4% of the selling price was the normal peacetime level of profit for a final processor; (11) That there was no way for final processors to absorb the increase in the costs of raw material that had taken place since 1942, or any other further increases.

With regard to the Administrator's findings as disclosed in his statement of con-

---

[8] Ibid. Page 249.

siderations that, while the industry was able to absorb increases in raw material prices in prior years, it can no longer absorb any further increases of raw material, we are confronted by the proven fact that the increase in the cost of raw material since the Administrator issued his statement of considerations has amounted to at least 8¾ cents a bushel. The cost of raw cucumbers in 1943 was $1.05 per bushel. At the time of the protest and hearing in this case, it was at least $1.1375 per bushel.

■ If it was necessary to grant increases in prices to final processors in 1943, because of the increase in the cost of the raw material, in order to insure a profit of 4% of the final selling price and thereby restore the industry to a normal peacetime level of profit it is likewise necessary in accordance with the findings of fact in the Administrator's statement of considerations to grant price increases now in order that the maximum prices maintained under a regulation be generally fair and equitable. The cost of raw materials has further increased. If the statement of considerations for the Regulation is still valid, the industry is not able to absorb such increase in costs; and if it is not able to absorb such increases, it will not receive, from the maximum prices maintained at present, the rate of 4% of the final selling price, which the Administrator finds is the normal peacetime level of profits. Thus, since the normal industry profit is 4% of the selling price, an increase in the cost of raw material in excess of $1.05, which amounted to more than 4% of the final selling price, would result in a loss to the industry as compared to its peacetime operations; and an increase in the cost of raw material to the processor in any amount in excess of $1.05 per bushel would result in at least a reduction of the industry's normal peacetime profits. In such case, the maximum prices presently maintained would not now be generally fair and equitable, for this is interpreted as requiring the maintenance of price ceilings which return profits in line with those received by the industry in a normal peacetime period. Price increases are required to compensate complainants for cost increases which the industry cannot absorb without impairment of its normal peacetime earnings. Gillespie-Rogers-Pyatt Co. **v.** Bowles, supra.

To these conclusions, the Administrator does not assert that the statement of considerations is erroneous or that his views as therein expressed have changed. It is not contended that the industry is now able to absorb increases in the costs of raw materials since 1942, contrary to his previous conclusions. Nor is it maintained that the level of peacetime profits is less than 4% of the selling price of final processors which the Administrator found to be the historic profit pattern of the industry as a result of his investigations and consultations. Rather the entire answer of the Administrator is that complainants have not assumed and carried forward the overwhelming and practically impossible burden of proving and comparing the over-all earnings, of the entire industry with its earnings in a representative peacetime period. It is our conclusion that this is an unnecessary burden for the complainants to sustain in the case before us. For the Administrator himself, as disclosed by his statement of considerations has gone so far in his broad investigations and consultations with the industry and has made such extensive findings of fact and ultimate conclusions that he has thereby performed for complainants everything that he now seeks to require them to do. His findings, upon which complainants now rely, sustain their contention that the maximum prices which were established a year before the filing of the protest were not, as of the time of the protest and hearing, generally fair and equitable.

Were complainants to prove that it is impossible for the industry to absorb any increases in the cost of raw material subsequent to 1942; that 4% of the final selling price is the normal peacetime level of profit for processors, and that increases in parity since 1942 require, in this particular commodity and industry, an increase in the processors' prices in order to restore the industry to its peacetime level of profits, then the increases in the cost of raw materials, as is here admitted in the answer of the Administrator, would require a holding that maintenance of the former maximum prices as fixed in the Regulation would be generally unfair and inequitable. But, as heretofore said, proof of these facts by complainants is not necessary because it is upon a finding of the existence of those very facts by the Administrator in his statement of considerations that the Regulation in question is based and upon which it was issued.

■ The rule is that where parties complain of a regulation, they must offer evi-

dence to disprove the facts relied upon by the Administrator in establishing maximum prices, as the presumption is that the facts relied upon by him in his statement of considerations are presumed to be correct. Philadelphia Coke Co. v. Bowles, supra. To sustain the contention of the Administrator in this case would be to hold, in effect, that the burden is upon the complainants to prove that the facts upon which the Administrator relied in issuing Maximum Price Regulation No. 488, and as disclosed in his statement of considerations, are correct, and that unless the complainants establish by proof that such findings of fact are correct, they will be presumed to be incorrect.

The necessary statutory basis, and legal justification for the issuance of a regulation, as disclosed by the history of the price control legislation, is the statement of considerations. Without this, no one could intelligently formulate a protest. Without it, there would be no way to provide against ill-considered and irresponsible action on the part of an Administrator; and there would be no medium of exposing the grounds, upon which the price regulations were based, to public scrutiny. If in the instant case the statement of considerations is still valid—and it is presumed to be valid and correct until proven otherwise—the maximum prices presently maintained do not conform to the pricing standard conceded by the Administrator to be applicable, because in view of increased costs they can not return profits in line with those received by the industry in the normal peacetime period.

What has been said with reference to the final processors under the Regulation obviously applies also to the salters and briners. Other questions suggested in the briefs of counsel are unnecessary to our determination. With regard to the contention of the Administrator that the general fairness and equity of the Regulation was not challenged in the protest, and that the complainants in the proceedings before the Administrator presented no facts which would tend to make questionable the validity of the Regulation, it is to be observed that, under the special circumstances and facts of this case, the charge that the maximum prices established by the Regulation did not reflect the increased cost of raw material to protestants, and the proof on the part of protestants of the increase in the price of raw material and increase in the parity price of cucumbers subsequent to the issuance of the Regulation, satisfied the requirement that the question of the general fairness of the Price Regulation must be raised before the Administrator, in order to save that question for consideration by this court.

On the ground that it is not generally fair and equitable, a judgment will be entered setting aside Section 3 of Maximum Price Regulation No. 488, in so far as it maintains maximum prices fixed on November 2, 1943, for salters and briners, and final processors without taking into consideration the increase in cost of raw material and the increase in the parity price of cucumbers that have occurred since the issuance of the Regulation.