INTERWOVEN STOCKING CO. v. BOWLES, Price Administrator.

No. 45.

United States Emergency Court of Appeals. Heard at New York Jan. 5, 1944.

Decided April 3, 1944.

Eugene W. Leake, of New York City, for complainant.

Nathaniel L. Nathanson, Associate General Counsel, of Washington, D.C. (Richard H. Field, Acting General Counsel,

Jacob D. Hyman, Chief, Court Review Price Branch, and Carl H. Fulda, John J. Downey, Jr., and Irving Schwartz, Attys., all of the Office of Price Administration, all of Washington, D.C., on the brief, for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

In this case the complainant, Interwoven Stocking Company, complains of the action of the Price Administrator in denying its protest against the application of the General Maximum Price Regulation[1] to the sale of men's half-hose manufactured by it. It appears that the complainant's sole business consists of the manufacture and sale of such hose under the brand name "Interwoven". The hose manufactured by it fall into three principal categories which it designates as staples, semi-staples and fancies. With respect to its lines of staples and semi-staples the complainant issued a revised price list on March 14, 1942, putting into effect price increases for most of those styles. These increased prices became under the terms of the Regulation the complainant's maximum prices for the styles to which they applied and the complainant is not here seeking to increase them. In the case of fancies, however, it is the complainant's practice to establish prices twice each year—in October for the so-called spring season, from January to June, and in March for the so-called fall season, from July to December. As the result of this practice the prices of its fancies in effect in March 1942 had been established in October, 1941. The complainant contends that these prices, having been established nearly six months previously on the basis of conditions then prevailing, did not reflect the increases in costs of materials and labor which had taken place in the interim. Its principal ground of protest was that since the fancies constituted the major part of its output,—two series, Nos. 3.000 and 5.000, alone comprising 64% of it—the freezing of these prices under the Regulation as maximum prices would subject the complainant to irreparable loss and hardship.

In its protest the complainant accordingly requested certain increases in its maximum prices, including those for the two lines of fancies mentioned and for certain lines of its semi-staples.

The Administrator treated the complainant's protest as a protest against the validity of the General Maximum Price Regulation as applied to the complainant's business and also as an application for adjustment under the adjustment provisions contained in paragraphs (b) and (c) of Section 18 of the Regulation. Since the complainant offered no evidence tending to show that the Regulation was not generally fair and equitable to the men's hosiery industry as a whole the Administrator concluded that the protest, considered as a protest against the Regulation, must be denied. Considered as an application for individual adjustment, he concluded that it must also be denied because the complainant had failed to show that the operation of the Regulation had in fact caused it any substantial hardship.

We are satisfied that the Administrator did not err in holding the General Maximum Price Regulation to be valid as applied to the complainant's business. The complainant urged that the Regulation was not generally fair and equitable as applied to its business and consequently did not meet the standard for validity laid down in the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq. We have held that it is the effect of a regulation upon the industry as a whole which must be considered in determining the question whether the Regulation is generally fair and equitable within the meaning of the act.[2] The complainant in support of its contention, however, presented evidence merely as to the impact of the Regulation upon its own business and did not assert that its experience was typical of the men's hosiery industry as a whole. On the contrary the complainant urged that its own experience was all that was relevant because, being the only manufacturer in the country engaged exclusively in the manufacture of men's hosiery, it comprises a separate industry consisting of but one member. We think that this contention is without merit and that it is clear that the

---

[1] 7 F.R. 3153.

[2] Chatlos v. Brown, Em.App.1943, 136 F.2d 490; Wilson v. Brown, Em.App. 1943, 137 F.2d 348; Spaeth v. Brown, Em.App.1943, 137 F.2d 669; United States Gypsum Co. v. Brown, Em.App. 1943, 137 F.2d 803; Philadelphia Coke Co. v. Bowles, Em.App.1943, 139 F.2d 349.

complainant is a member of an industry which includes all those engaged in the manufacture of men's hosiery, those who manufacture it in connection with other products as well as those who manufacture nothing else. Moreover, even if it should be assumed that the complainant is the sole member of a unique industry, we would still conclude, for reasons about to be stated, ·that the Administrator was justified upon the evidence in refusing to hold that the Regulation as applied to the complainant alone was not fair and equitable.

█ The conclusion just stated is a corollary to our next conclusion which is that the Administrator did not err in deciding that the complainant had not shown itself to be entitled to an adjustment of its maximum prices under the adjustment provisions of the General Maximum Price Regulation. For the purposes of this case we need not consider in detail all the requirements of the two adjustment provisions involved or determine whether the complainant has brought itself within them. It is sufficient to say that each of them requires a showing on the part of an applicant for adjustment that the application of the Regulation to his business is causing him substantial hardship. That showing the complainant in this case has failed to make. On the contrary the evidence established that up until the close of the period covered by it the complainant not only had not suffered any hardship but in fact had shown an increase in its net income over that enjoyed in earlier years.

Thus it appears from the evidence taken from the complainant's own books of account that its gross sales and net profit from operations for recent periods were as follows:

adjustments which can only be made at the end of the calendar year when the physical inventory is taken. There is, however, nothing in the evidence to indicate that after these adjustments are made profit for the full year 1943 will be less than that realized in 1942.

The complainant attempts to counteract these figures, which have been taken from its own books, by the evidence of its chief accountant as to adjustments which he claims should be made in the figures for 1942 and the first six months of 1943 in order accurately to reflect the results of the complainant's operations for those periods. The complainant points to the fact that as the result of the existence of certain future delivery contracts for the purchase of yarn at favorable prices, much of the yarn which it secured and used in its manufacturing operations in 1942 and 1943 was worth in the market substantially more than its actual cost. The complainant also points to the fact that during the year 1942 two separate wage increases were granted to its employees. Its contention is that the actual cost of goods sold in 1942 as shown by its books, $6,485,417, should be adjusted by the addition of $322,322, which it stated to be the difference between the actual cost to the complainant of the materials used in the manufacture of these goods and the market value or replacement cost of those materials in 1942 plus the addition of $100,901 which is stated to be the increased labor costs which would have been incurred if the wage increases granted during the year had been in effect for the entire year. If these adjustments, totalling $423,223, are made the net profit from operations shown by the complainant's books for 1942 is transformed into a net loss.

|  |  | Net Profit from Operations | |
| Period | Gross Sales | Amount | Percentage of Gross Sales |
| --- | --- | --- | --- |
| 4 years average 1936–39 | $6,187,268 | $185,040 | 2.97 |
| 1940 | 6,741,274 | 235,842 | 3.49 |
| 1941 | 8,094,413 | 207,711 | 2.56 |
| 1942 | 8,485,670 | 268,650 | 3.16 |
| January to June 1943 | 5,223,889 | 492,130 | 9.42 |

It may well be true, as the complainant suggests, that the profit for the first six months of 1943 is unduly large because it does not reflect the necessary inventory

█ We think that complainant's contention in this regard is without merit and that the Administrator was fully warranted in taking the complainant's income state-

ment for the year 1942 as prepared from its books to be a true picture of the result of its operations for that year. This statement, as the complainant admits, was prepared in accordance with recognized and accepted accounting practice. The net income shown thereby was reported by the complainant for income tax purposes and income and profits taxes were paid thereon. The arguments advanced by the complainant in support of its proposed revision of this statement are difficult to understand. Apparently one theory is that since the yarns on hand could have been sold in 1942 for more than they cost the complainant was entitled to realize their increased value through the sale of the hosiery into which they were incorporated at a price sufficient to recover this unrealized increment in addition to actual cost and ordinary profits. Another theory seems to be that as to the finished hose on hand which could not have been reproduced at their actual production cost the complainant was entitled to recover by sale their theoretical reproduction cost and a profit.

■■ The difficulty with these theories is that they seek to transform into an inviolable property right an unearned and wholly speculative increment in value which can never be recovered unless the property in question is sold for a price sufficient to realize it. We think that what the complainant really seeks is the right to make a special wartime profit on what is in effect a peacetime inventory and this in addition to its normal peacetime profit on that inventory. Neither the Fifth Amendment to the Constitution nor the Emergency Price Control Act requires that a price regulation which is generally fair and equitable to an industry shall assure to each member of the industry a profit over actual cost,[3] let alone such a speculative and unearned profit as this. The complainant's reference in this connection to those cases which have held that a public utility is entitled to a return upon the fair value of its property is clearly inapposite, as we had occasion to point out in Wilson v. Brown, 1943, 137 F.2d 348, 351. We find no merit in the complainant's contention that the imposition by the Regulation of maximum prices in 1942 confiscated its right to this increment in violation of the fifth amendment.

The point may, however, be relevant insofar as it suggests the inevitability of losses in later years when the complainant's actual costs should reach current levels. In this connection, therefore, the complainant's actual experience in the first six months of 1943 becomes highly relevant. As has been stated, the complainant's accounts for this period show a net profit from operations of $492,130. This is based upon the actual cost of goods sold amounting to $3,962,268. If we increase the cost of the goods sold during this period by $264,389, the asserted difference between the market or replacement value of the goods and their actual cost, the net operating profit for the period is reduced to $227,741. The amount, however, still remains greater than the net profit of the complainant for 1941, the year immediately preceding price control. It thus appears that even if the inventory adjustments required to be made at the end of 1943 should wipe out all profit for the second half of the year, which seems most unlikely, the net profit for the year would still substantially equal that for 1942 and would exceed the profit realized during 1941.

Moreover it is clear that the favorable 1943 result came about in spite of the fact that in the first six months of that year most of the increased costs to which the complainant refers had actually been realized. The increased labor costs brought about by the wage increases of 1942 were in effect during the entire period. As to costs of raw material the evidence of the complainant's chief accountant is that the difference between actual cost and replacement cost in March 1942, was 30.54%, in December 1942, 13.90%, in March 1943, 4.09% and that on August 20, 1943 when his affidavit was made there was no substantial difference between the actual cost and replacement or market cost of the raw material used by the complainant. The necessary conclusion is that the complainant's fear of disappearing profits and actual losses as a result of increased costs has not been realized in its experience under the operation of the Regulation.

This result would appear at first blush to be quite inexplicable but there are in the evidence indications as to the reasons why it has come about. One is that the com-

---

[3] Philadelphia Coke Co. v. Bowles, Em. App.1943, 139 F.2d 349; United States Gypsum Co. v. Brown, Em.App.1943, 137 F.2d 803; compare Bowles v. Willingham, 1944, 64 S.Ct. 641.

plainant's selling, advertising and administration expenses actually decreased in 1942 and 1943, both in total amount and percentagewise, from what they had been in 1941. Another is that during the same period the complainant's gross sales substantially increased. These changes are shown in the following table:

| | | Selling, Advertising and Administration Expenses | |
| Period | Gross Sales | Amount | Percentage of Gross Sales |
|---|---|---|---|
| 4 years average 1936–39 | $6,187,268 | $1,363,154 | 22.03 |
| 1940 | 6,741,274 | 1,553,928 | 23.05 |
| 1941 | 8,094,413 | 1,829,058 | 22.59 |
| 1942 | 8,485,670 | 1,731,603 | 20.40 |
| January to June 1943 | 5,223,889 | 769,491 | 14.73 |

It will be seen from these figures that not only have the complainant's selling, advertising and administration expenses decreased from a pre-price control level of about 22½% of gross sales to 20.4% in 1942 and less than 15% in the first half of 1943, but that the actual decrease in the total amount of these expenses in the price control period as compared with 1941 has been accompanied by a very substantial increase in the total of gross sales. In other words it appears that the complainant has been able under price control substantially to increase its sales while at the same time actually decreasing its selling, advertising and administration expenses. Both factors operate cumulatively to reduce the share of these overhead expenses allocable as part of cost to each unit of hose sold and thereby to reduce the cost of the unit and increase the profit derived from its sale. The evidence indicates that these factors have completely offset the complainant's increased costs of material and labor and have thus preserved and in fact actually increased its net operating profits. In achieving this result by increasing sales and at the same time reducing expenses the complainant has demonstrated its ability to adjust its operations to the war-time economy in the same way as has been done by other industries which have come within our observation.[4]

The complainant also makes the assertion that in addition to the adjustment already discussed the net income shown by its books for 1942 and 1943 should be further adjusted by deducting therefrom the income and profits taxes which it has been required to pay thereon. Its contention is that the portion of its net income remaining after the payment of taxes is the figure which should be compared with its pre-price control net income in order to determine whether it has suffered a hardship under price control. The contention is wholly without merit. If it were accepted the complainant would be accorded the right to escape its share of war-time taxation by passing the burden of its taxes on to its customers in the form of increased prices for its hosiery. Certainly neither the Constitution nor the act accords to the complainant any such unique tax exemption.

The complainant also sought in its protest and by affidavits filed with the Administrator to establish a case of hardship with special reference to the cost of producing its lines of fancies of series Nos. 3.000 and 5.000 which, as has been said, account for 64% of its sales. In support of this contention it presented to the Administrator at various stages of the proceeding figures indicating that it was suffering actual losses on the sales of these lines. The amounts claimed as such losses progressively decreased as the proceeding was carried through, however, and the figures offered in support of the contention were so varied and inconsistent as fully to justify the Administrator in giving them no credence, especially in the light of the favorable net results of the complainant's operations.

The complainant's contention that the Regulation is invalid because the Ad-

---

[4] Compare Madison Park Corporation v. Bowles, Em.App.1943, 140 F.2d 316; Philadelphia Coke Co. v. Bowles, Em. App.1943, 139 F.2d 349; Spaeth v. Brown, Em.App.1943, 137 F.2d 669; Chatlos v. Brown, Em.App.1943, 136 F.2d 490.

ministrator failed before issuing it to advise and consult with representative members of the complainant's industry is without merit. Sec. 2(a) of the act provides that "Before issuing any regulation or order under the foregoing provisions of this subsection, the Administrator shall, so far as practicable, advise and consult with representative members of the industry which will be affected by such regulation or order." The General Maximum Price Regulation states that "So far as practicable the Price Administrator consulted with representatives of trade and industry." In view of the all inclusive scope of the Regulation and of the urgent necessity for its prompt issuance consultation with each industry to be affected was clearly not practicable and was, therefore, not required by the act.

▮▮▮▮▮ The fact, found by the Administrator, that the complainant "has not incurred any actual loss but on the contrary has experienced more favorable operating results than at any time since 1936" which, as we have shown, was fully supported by the evidence, not only justified the denial of the protest but also deprived the complainant of its standing to raise the point, strongly urged at argument, that the Regulation deprives it of its property without due process of law in violation of the fifth amendment. Moreover this and the other constitutional questions raised by the complainant have just been fully considered and decided by the Supreme Court in Yakus v. United States, 1944, 64 S.Ct. 660. We accordingly need not discuss them here. Nor, in view of our conclusion that the complainant's protest, considered as an application for adjustment, was without merit, do we think it necessary to pass upon the question whether the action of the Administrator in denying it as such an application is properly before us for consideration in this proceeding. Likewise, in view of the complainant's failure to show hardship we are not called upon to consider its contention that the Regulation is unjust and inequitable because it does not contain an adjustment provision fitted to the complainant's 'case. It will be time enough to consider this question, as well as the other attacks upon the Regulation made by the complainant, when and if it should appear that the Regulation has resulted in an unreasonable decrease or a complete wiping out of the profits of the men's hosiery industry, thus affording new

and more appropriate grounds for protest. See Philadelphia Coke Co. v. Bowles, Em.App. 1943, 139 F.2d 349, 356.

The complaint is dismissed.