**PACIFIC GAS CORPORATION v. BOWLES, Price Adm'r.**

No. 258.

United States Emergency Court of Appeals.

Heard at Providence, R. I., Nov. 14, 1945.

Decided Feb. 13, 1946.

454

Before MARIS, Chief Judge, and MA-GRUDER and McALLISTER, Judges.

Renah F. Camalier, of Washington, D. C. (Isador S. Levin, of Fall River, Mass., Vincent J. Grace, of New Bedford, Mass., and Charles H. McCarthy, of Washington, D. C., on the brief), for complainant.

Samuel M. Singer, Atty. of Office of Price Administration, of Washington, D. C. (Richard H. Field, General Counsel, and Jacob D. Hyman, Associate General Counsel, both of Office of Price Administration, both of Washington, D. C., on the brief), for respondent.

McALLISTER, Judge.

This case involves an order issued by the Office of Price Administration pursuant to Maximum Price Regulation No. 88 [1]—Fuel Oil, Gasoline, and Liquefied Petroleum Gas.

Complainant is a Rhode Island corporation located at Fall River, Massachusetts. Since June, 1942, it has been engaged in the sale of gasoline, described as 14 pound Reid Vapor Pressure natural gasoline. It purchases such gasoline from the Warren Petroleum Corporation, of Tulsa, Oklahoma. It then sells the gasoline in the district in which it is located, designated as Petroleum Administration for War District No. 1, which includes the New England area. Complainant does not own or operate any storage or terminal facilities. The natural gasoline which it purchases from the Warren Corporation is shipped directly by that corporation to complainant's customers.

At the outset, it may serve to clarify the discussion to observe that complainant, throughout the proceedings, is referred to as a "marketer", as contrasted with a broker or producer. The term means no more than that complainant is a seller—in this case, of gasoline of which it had become the owner, by reason of its purchase from the Warren Company. It is distinguished from a broker inasmuch as it does not receive a commission upon sales, but rather seeks a profit on the sale of its own property. Being a purchaser from the producer, and a seller to the public, it occupies the merchandising position of a so-called "middleman".

On September 28, 1944, the Office of Price Administration concluded that complainant had been selling natural gasoline since 1942 at prices violating Regulation No. 88 and, therefore, issued an order, under Section 8.3 of the Regulation, establishing maximum prices for complainant, retroactively to a date fifteen days after its first sale—which was more than two years prior to the date of the order. Complainant filed protest, and upon findings adverse to its claims which were entered by a Board of Review, and which were adopted by the Administrator, the present complaint was filed.

Complainant contends that it was entitled to have its maximum prices established under Section 5.3 of Maximum Price Regulation No. 88; that the orders issued under Section 8.3, establishing complainant's maximum prices were unlawfully discriminatory; that such orders prevented complainant from realizing any mark-up whatever, and were accordingly rendered invalid; that Maximum Price Regulation No. 88, and particularly Amendment 19 thereto, is generally unfair and inequitable because the prices thereby established for the sale of natural gasoline to ultimate consumers in Petroleum Administration for War District No. 1 were the same for refiners, terminal operators, and other sellers; and that the Regulation and Amendment illegally discriminated against complainant by providing for an additional ⅛ cent per gallon mark-up to "eligible marketers", shipping natural gasoline to ultimate destinations in all Petroleum Administration for War Districts *other than* Petroleum Administration for War District No. 1, in which complainant is located and does business.

Of the above contentions of complainant, the one upon which chief reliance is placed, is that complainant's maximum prices had been properly adopted under Section 5.3 of Maximum Price Regulation No. 88, and that all of its sales during the period in question were made in accordance therewith. In passing upon this contention, we come to the consideration of the pricing provisions of Maximum Price Regulation No. 88.

In Section 5.1 of the Regulation, it is provided: "A seller's maximum price for a petroleum product of a particular grade shall be the lowest quoted price published in the October 8, 1941, issue of the National Petroleum News for a product of the same grade."

Section 5.2 provides that if prices "cannot be determined under Section 5.1, the maximum price for each seller * * * shall not exceed the price charged at that point (the given shipping or delivery point) by him on the last sale of the same product to a purchaser of the same class within 60 days prior to October 15, 1941."

Sections 5.1 and 5.2 above mentioned, being inapplicable for the determination of complainant's maximum prices, the next provision, and the one upon which complainant relies, is Section 5.3.

Section 5.3 provides for the determination of a seller's maximum price in accordance with the maximum price of another seller at the same point. In this case, complainant contends that its maximum price should be determined in accordance with the maximum price at the same place of its supplier, the Warren Petroleum Corporation.

The provisions of Section 5.3 are as follows: "When a seller's maximum price at a given shipping point for any petroleum product covered by this regulation cannot be determined under section 5.1 or 5.2, his maximum price at the particular shipping point shall be the highest maximum price determined under section 5.2 for the same shipping point of any seller of the same class to a purchaser of the same class. When a seller's maximum price at a given delivery point for any such petroleum product cannot be determined under section 5.1 or 5.2, his maximum price at the particular delivery point shall be the highest maximum delivered price determined under section 5.2 for the same delivery point of

a seller of the same class to a purchaser of the same class."

It is the claim of complainant that until the date of the order determining its maximum prices retroactively, to a date two years prior thereto, it had made sales of the natural gasoline in question at prices based upon ceiling prices represented to it by its supplier, the Warren Corporation, as its ceiling prices, and that it had ascertained by inquiries and by answers in writing from the Warren Corporation that such prices were actually its ceiling prices. It further asserts that Warren was of the same class of seller as complainant, and sold to the same class of customers. Proof of the foregoing, it is urged, requires the conclusion that complainant's maximum prices are properly determinable in accordance with the maximum prices of the Warren Corporation, under Section 5.3 above mentioned.

To this argument, the Administrator replies that complainant was not of the same class of seller as Warren; that it did not sell to the same class of purchaser; and that, in any event, Warren's maximum price had never been established under Section 5.2, as required by the provisions of Section 5.3 if complainant's maximum prices were to be determined in accordance with Warren's. With regard to Warren's representations of its ceiling prices to complainant, the Administrator found that these consisted of mere general statements and were not proof that Warren's maximum prices had properly been determined—and that, in fact, Warren's alleged maximum prices as appeared in the letters to complainant had never been properly established under any provisions of the Regulation.

■ As to whether complainant is a seller of the same class as Warren within the intendment of Section 5.3, the Administrator, in his opinion accompanying the order denying the protest, held that "sellers, to be 'sellers of the same class', for the purposes of application of Section 5.3" were such, "only if at the point or points at which they sold in the period immediately preceding October 15, 1941, they customarily charged the same price, or approximately the same price, for the same product, on sale to purchasers of the same class." While Section 5.3 makes no mention of the period of time "immediately preceding October 15, 1941," the period referred to by the Administrator in his opinion, that section does provide for the fixing of a seller's maximum prices on the basis of the maximum prices of competitors that were determined under Section 5.2; and the latter section provides for the determination of such competitors' maximum prices, on the basis of prices charged in the sixty days' period immediately preceding October 15, 1941. The above-mentioned construction and interpretation of the Regulation by the Administrator appears to us reasonable, and is, therefore, here controlling; and under such interpretation complainant could not be a seller in the same class as Warren since it did not sell in the period immediately preceding October 15, 1941, but on the other hand, did not enter business until June 1942.

■ With regard to whether the sales made by complainant and by Warren were to the same class of purchasers (which is required to be shown if complainant's maximum prices are determinable in accordance with those of Warren, under Section 5.3), a reference to the language of the Regulation to ascertain the meaning to be give thereto discloses that "purchasers of the same class" as used in Sections 5.2 and 5.3, "refers to the practice adopted by the seller in setting different prices for a commodity for sales to purchasers performing different functions, * * * or for purchasers performing the same function but located in different areas, or buying in different quantities or grades or under different conditions of sale." (Section 5.2) We find no evidence in the record as to the class of purchasers to which Warren's alleged maximum prices were applicable, and, therefore, are constrained to conclude that complainant has failed to establish that its sales and those of Warren, upon which it relies, were made to the same class of purchasers, as is required if complainant's maximum prices are to be established under Section 5.3.

■ Moreover, complainant did not show that Warren's maximum prices, which complainant had allegedly adopted pursuant to Section 5.3, were maximum prices which Warren had properly determined under Section 5.2. In order to prevail in its contention that its maximum prices are, under Section 5.3, determinable in accordance with Warren's maximum price at the same shipping points, it must appear that Warren had established maximum prices by previous sales of natural gasoline at these

points during the base period, August 15–October 15, 1941 (Section 5.2). There is no evidence that Warren was selling natural gasoline at the points in question during the base period, and, therefore, there is no proof that Warren could have established a maximum price under Section 5.2. Since this was the fact, complainant could not, under Section 5.3, have established a maximum price in accordance with Warren's maximum price, for such a maximum price, for complainant, under Section 5.3, depended upon Warren's establishment of its maximum price under Section 5.2. It is further to be remarked, in this connection, that subsequent to the filing of complainant's protest but prior to the entry of the order denying such protest, Warren's own maximum prices were, without question or objection, determined retroactively under Section 8.3. This fact in itself seems an additional and most persuasive demonstration that Warren could never have established a maximum price under Section 5.2, as Section 8.3 is only applicable when maximum prices cannot be determined under Sections 5.1, 5.2, or 5.3.

From the foregoing, it conclusively appears that complainant has failed to establish that its maximum prices could properly have been determined under Section 5.3.

Since complainant's maximum prices were not determinable under Sections 5.1, 5.2, or 5.3, the Administrator necessarily proceeded to determine them under the only remaining price provision of the Regulation, Section 8.3.

Section 8.3, in so far as here applicable provides:

"(a) If under any preceding section of this regulation a seller is unable to determine the maximum price at a given shipping or delivery point for any product covered by this regulation then the seller may nevertheless make the sale of such product at the said point or may notify the Office of Price Administration in writing that he has set a tentative maximum price for the product at the shipping or delivery point. In giving notice of the setting of such tentative maximum price or within 15 days of the making of the said sale, the seller shall file with the Petroleum Branch of the OPA a written request for the approval of either the tentative or sale price. * * *

"(b) If a seller shall fail to report a sale as required by paragraph (a) above, the OPA may at any time upon written notice to the seller establish his maximum price for the particular product at the particular point effective retroactively to a date 15 days after the making of the said sale."

In accordance with the foregoing section, the Administrator, by order issued September 28, 1944, established complainant's maximum prices retroactively to a date fifteen days after the making of complainant's first sale in June 1942. These prices were fixed in "dollars and cents", f.o.b. at shipping points, with provision for computing maximum delivered prices. It may here be remarked that dollar and cent maximum prices for natural gasoline were not provided for in Maximum Price Regulation No. 88 until there was issued Amendment No. 19 to the Regulation, effective October 23, 1944, which, among other provisions, established uniform dollar and cent f.o.b. shipping point prices for all sellers shipping natural gasoline into Petroleum Administration for War District No. 1, including complainant. Until the addition of Amendment No. 19 [2] to the Regulation, complainant's maximum prices could be established only by the application of the various formulas provided by Regulation No. 88, or by the issuance of a specific order in the event that the automatic provisions for the determination of maximum prices were not applicable.

Subsequent to the order of September 28, 1944, fixing dollar and cent maximum prices retroactively for complainant, the Administrator issued another order on November 17, 1944, extending the coverage of the September order, by authorizing f.o.b. maximum prices at additional shipping points, and modifying the delivered prices established in the September order, to reflect the f.o.b. prices established on October 23, by Amendment 19 to the Regulation. In comparing the orders issued to complainant on September 28, 1944 and November 17, 1944, no variance is found in the maximum prices established on an f.o.b. shipping point basis. With regard to Amendment No. 19, establishing dollar and cent prices under the Regulation, it appears in the Statement of Considerations accompanying the issuance of the Amendment, that the maximum prices established in terms of dollars and cents, were based on October, 1941 prices as required by Section 2(a) of the Emergency Price Control

Act of 1942, as amended, 50 U.S.C.A.Appendix, § 902(a).

Complainant attacks the Regulation as amended by Amendment No. 19 on the ground that it is arbitrary in establishing identical prices for refiners, terminal operators, marketers, and other vendors selling in Petroleum Administration for War District No. 1. It asserts that identical ceiling prices determined for its supplier and for itself fail to provide for any reasonable profit on its sales.

The reason for establishing the same maximum price for refiners and marketers, was that the Administrator found that, during the base period of the Regulation, refiners and marketers had actually sold their petroleum products at the same general level of prices to the same classes of purchasers. Under such circumstances, the query is suggested how, during the base period, a marketer could have secured a profit, if refiners sold to the same classes of purchasers at the same price that was charged by the marketer. The answer is that, according to the finding of the Administrator, the marketers were normally able to purchase gasoline from the refiners at prices below the refiners' selling prices to other purchasers.

 In establishing the same maximum price for sales to consumers by both refiners and marketers, the Administrator was continuing the pattern of the price structure that existed during a representative peacetime period, and the Regulation would not, in such a case, be invalid because it failed to provide for a profit to complainant over and above the ceiling prices of the Warren company. Interwoven Stocking Co. v. Bowles, Em.App. 1944, 141 F.2d 696. Moreover, as is pointed out by counsel for the Administrator, the maximum prices which were established, in this case, under Amendment No. 19, would not force complainant out of business, if it continued to be able to purchase from the Warren company below that company's maximum prices, as in most instances it appeared that it had done, during the period of complainant's operations. No evidence was introduced by complainant to show what would be the actual and specific effect of the prices established by Amendment No. 19 on its operating position. Under the circumstances above mentioned, we are unable to agree that the provision fixing the same maximum prices for refiners and marketers is arbitrary.

 Amendment No. 19, in Special Section 1 of Article IV of the Regulation, as amended, authorized all "eligible marketers" to add a mark-up of ⅛ cent per gallon to the established f.o.b. refinery price, on f.o.b. refinery shipments to ultimate destinations *other than in Petroleum Administration for War District No. 1*. Special Section 2 of Article IV authorized all "eligible brokers including brokers shipping natural gasoline into Petroleum Administration for War District No. 1 to add ⅛ cent brokerage commission." "Eligible marketers" and "eligible brokers" are defined in Sections 1.14(j) and (k) of the Regulation, respectively, to include persons who in the sixty day period preceding January 15, 1944, were engaged in the business of marketing and/or broking petroleum products, except such persons as refiners, bulk plant or terminal operators, or any corporation in whole or part owning or owned by such persons.

Complainant charges that it was unlawfully discriminatory for the Administrator to authorize eligible marketers to charge an additional ⅛ cent per gallon on the above-mentioned shipments of natural gasoline in all Petroleum Administration for War Districts—except District No. 1, where it operated.

The reasons why the Administrator authorized a charge of ⅛ cent per gallon to marketers in certain districts, but not in District No. 1, appear in these facts officially noticed by the Administrator: Normally, petroleum products, including natural gasoline, moved into Petroleum Administration for War District No. 1 from the Gulf and Caribbean coast areas by tanker. Brokers, rather than marketers (as defined in Section 1.14(j) of the Regulation), customarily handled the sales of such imported gasoline in District No. 1. However, in the other districts, marketers customarily handled such shipments for delivery. Such marketers, in the other districts, were able to sell their products at the prevailing refinery ceiling prices due to the fact that they were able to secure their profit by purchasing from the refineries at prices below the refinery ceiling prices to consumers. However, the Administrator found that because of shortage of supply and increased demand for natural gasoline, the refiners tended to eliminate marketers from the

system of distribution as it had been developed in Petroleum Administration for War Districts Nos. 2, 3, and 4. In order, therefore, to avoid their loss of profits and a disruption of the normal operations of a group of sellers which had existed in the areas—where such charge was granted—prior to the price control, the Administrator granted them the ⅛ cent per gallon increase. However, the Administrator found that, historically, marketers such as complainant had not operated in Petroleum Administration for War District No. 1 during the base period. Importers customarily had been refiners or terminal operators who sold the gasoline to consumers in that area directly or through brokers. Complainant does not show, or undertake to show, that its situation is substantially the same as that of marketers shipping into Petroleum Administration for War Districts Nos. 2, 3, and 4. On the contrary, it affirmatively appears that the situation in District No. 1 has always been historically different from that in other districts. Complainant's claim of unlawful discrimination, resulting from the Regulation, against marketers in District No. 1 as contrasted with marketers in the other districts must, therefore, fail.

■ Complainant claims that it is inequitable to permit an "eligible broker" selling in District No. 1 to add the ⅛ cent mark-up while it is denied to "eligible marketers" in the district. It is further argued that, since purchasers, wherever located, were subject to this additional charge, the control of inflation was not involved in refusing District No. 1 marketers the same mark-up as was granted the brokers, and that such discrimination is arbitrary and unfair. This argument fails to take into account that brokers formed a part of the distributing system in District No. 1 during the base period, while marketers, of complainant's type, did not customarily handle natural gasoline in that area prior to price control. It might well be that the Administrator considered that complainant and its producer, Warren, were performing similar marketing functions at the same level of distribution, and that an allowance of a mark-up to complainant, as a middleman that had not been in business during the base period, would inevitably increase the ultimate price at which the product was sold to the public, with results inimical to the system of price control. We are of the opinion that the Administrator was jus-

tified in making provision to afford relief from financial hardship to the important group of brokers that had constituted an integral part of the industry and had existed in the area in question during the base period, without granting a corresponding increase in price to middlemen who had never been a part of the peacetime pattern of the industry.

Many of complainant's contentions are founded upon its claim of good faith, in relying upon what it considered were Warren's maximum prices. It asserted that it had obtained from Warren sufficient assurance as to the accuracy of such prices and the fact that they were actually the established maximum prices of its supplier. It contends that there was no additional burden upon it to ascertain that Warren had properly established such prices under the applicable provisions of the Regulation. However, the use of the pricing methods under the Regulation was limited to sellers who could actually qualify under the proper sections; and Warren's prices could be established only under Section 8.3. To the claim that it was an undue burden upon complainant to ascertain the actual correctness of Warren's maximum prices, it is to be remarked that under the procedural regulation, a seller may ask official advice with regard to such matters from the Office of Price Administration.

■ It must be evident that complainant makes a most persuasive case for its own good faith. It sought to find what Warren's maximum prices were, obviously in order to base its own prices upon them, and apparently relied upon Warren's advice, and assumed that its own prices were properly based thereon. Complainant might well consider—though erroneously—that it was of the same class of seller as Warren, and sold to the same class of purchaser, and thus conclude that its maximum prices were properly determinable under Section 5.3, as contended. But such were not the facts, and these considerations are rather in the nature of defenses that might be availed of in enforcement proceedings under Section 205(e), 50 U.S.C.A.Appendix, § 925 (e). See Saunders Petroleum Company v. Bowles, Em.App.1945, 152 F.2d 112.

■ Complainant's contention that Section 8.3 is invalid on the ground that it vests discretionary power in the office of Price Administration as to whether the orders establishing maximum prices there-

under shall be retroactive or not, as well as the attack upon the retroactive effect of the said section on constitutional grounds, was not raised in the protest proceedings, and complainant is not, therefore, in a position to raise such objections before this court. Bowman v. Bowles, Em.App.1944, 140 F. 2d 974, 975; Saunders Petroleum Company v. Bowles, supra.

In accordance with the foregoing, a judgment will be entered dismissing the complaint of the Pacific Gas Corporation.