196 F.2d 502
 NORMAN-FRANK, Inc., et al.
v.
ARNALL, Director of Price Stabilization.
 No. 569.
 United States Emergency Court of Appeals.
 Heard at Los Angeles, January 8, 1952.
 Reply Brief by Complainants Filed March 20, 1952.
 Decided May 2, 1952.
 Complaint Dismissed June 3, 1952.
 
 A. P. G. Steffes, Los Angeles, Cal., with whom George H. Zeutzius, Los Angeles, Cal., was on the brief, for the complainants.
 James A. Durham, Asst. Chief Counsel, Office of Price Stabilization, Washington, D. C., with whom Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section, and George Arthur Fruit, Attorney, Department of Justice, and Harold Leventhal, Chief Counsel, and Joseph T. Maioriello, Attorney, Office of Price Stabilization, all of Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.
 MAGRUDER, Judge.
 
 
 1
 This proceeding calls into question the validity of General Ceiling Price Regulation, Supplementary Regulation 5 — Retail Price for New and Used Automobiles (16 F.R. 1769), issued under the Defense Production Act of 1950, 64 Stat. 798, 50 U.S. C.A.Appendix, § 2061 et seq. Complainants, Norman-Frank, Inc., a corporation doing business in Los Angeles, California, as Jack Farmer's Autos, and Albert Rontell, were named as defendants and arraigned under an information filed in the U. S. District Court for the Southern District of California charging them with having sold, on or about March 9, 1951, a certain used Cadillac automobile for a price in excess of the maximum ceiling price. By leave of the district court, pursuant to § 408(e) (1) of the Act, the present complaint was filed in this court.
 
 
 2
 On January 26, 1951, the prices of used automobiles were frozen by the General Ceiling Price Regulation (GCPR — 16 F.R. 808) at the highest prices charged by individual sellers during the base period December 19, 1950, to January 25, 1951. Effective March 2, 1951, GCPR was superseded as to new and used automobiles by Supplementary Regulation 5 (SR 5), which was characterized by the Director of Price Stabilization in the accompanying statement of considerations as a "temporary means of correcting the pricing problems in this industry which have arisen by reason of the General Ceiling Price Regulation" (16 F.R. 1769). SR 5 has in turn since been superseded by CPR 83 effective October 15, 1951 (16 F.R. 10594), and by CPR 94, effective November 20, 1951 (16 F.R. 11639), so-called "tailor-made" regulations for the pricing of new and used automobiles, respectively. Since SR 5 was the controlling regulation on the date of the sale alleged in the criminal information, it is the only one with which we are here concerned.
 
 
 3
 The technique for determining ceiling prices on used cars which SR 5 established entailed the utilization of certain "used car guides", publications which are issued periodically and which list the average prices currently being charged for the various cars generally sold in the United States, classification being in accordance with the make, year and model of the cars in question. Several such guides are in general use in the used car industry. The regulation established as the maximum price for any used car the highest price listed for a car of the same make, year and model in the January, 1951, issue of whatever used car guide the particular seller had used during the period from December 19, 1950, to January 25, 1951. This pricing method was qualified by the further requirement that in no event should the ceiling price for a used car exceed the ceiling delivered price for a new car of the same make and model.
 
 
 4
 The complaint attacks the regulation on several grounds, some of which relate to the procedure and formalities with which the regulation was promulgated and some of which controvert on substantive grounds the validity of the pricing technique utilized. The answer admits the pendency of the criminal proceeding in California and asserts the validity of the regulation. The case is now before us on complainants' motion for judgment on the pleadings and on respondent's motions to strike all but formal and jurisdictional allegations of the complaint and to dismiss the complaint for failure to state a claim upon which relief can be granted. We shall consider first the alleged procedural defects and then pass on to the substantive objections to the regulation.
 
 
 5
 The procedural irregularities asserted are (1) that the Director, in issuing the regulation, did not conform to the statutory requirements with respect to prior consultation with representatives of the industry affected, (2) that he did not make certain required findings, and (3) that adequate data were not assembled before the regulation was issued.
 
 
 6
 With respect to the first objection above, § 404 of the Defense Production Act provides: "In carrying out the provisions of this title, the President shall, so far as practicable, advise and consult with, and establish and utilize committees of, representatives of persons substantially affected by regulations or orders issued hereunder." There was a similar provision in § 2(a) of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq. We repeatedly held under the 1942 Act that the Administrator had broad latitude within which to exercise independent judgment as to the extent to which it was practicable to consult with members of the industry before imposing controls, and that in seeking to upset a regulation on the ground of his failure to do so a complainant shouldered the heavy burden of establishing both that the Administrator failed to consult with the industry and that it would have been practicable for him to have done so. See Birtcherd Dairy, Inc. v. Bowles, Em.App.1945, 156 F.2d 1004, 1007; Interwoven Stocking Co. v. Bowles, Em.App. 1944, 141 F.2d 696, 701-2; Great Northern Co-operative Ass'n v. Bowles, Em.App.1944, 146 F.2d 269, 272; Seminole Rock & Sand Co. v. Fleming, Em.App.1947, 160 F.2d 542, 548. In fact, we never found occasion to set aside a regulation on this ground, even assuming the provision in question could have been deemed mandatory, and not directory merely. At any rate, the point has been rendered academic by a provision in the Defense Production Act of 1950 which had no counterpart in the Price Control Act of 1942. Section 709 of the present Act reads in part as follows:
 
 
 7
 "* * * Any rule, regulation, or order, or amendment thereto, issued under authority of this Act shall be accompanied by a statement that in the formulation thereof there has been consultation with industry representatives, including trade association representatives, and that consideration has been given to their recommendations, or that special circumstances have rendered such consultation impracticable or contrary to the interest of the national defense, but no such rule, regulation, or order shall be invalid by reason of any subsequent finding by judicial or other authority that such a statement is inaccurate." [Emphasis supplied.]
 
 
 8
 In conformity with the foregoing provision, the statement of considerations accompanying the issuance of SR 5 contains the following recital:
 
 
 9
 "This supplementary regulation is issued as a temporary means of correcting the pricing problems in this industry which have arisen by reason of the General Ceiling Price Regulation. Many urgent requests from members of the industry for immediate action in this area have been received and all the requests urge the action in order that individual sellers and buyers may have a clearer basis upon which to establish the ceiling prices for their transactions. No formal consultations with representatives of the industry have been possible because of the urgency of the situation. The regulation, however, will serve as an interim measure until a permanent industry regulation can be prepared with the advice of representatives of the industry and put into effect." (16 F.R. 1769)
 
 
 10
 Since it is stated by the Director that because of the urgency of the situation no formal consultation with representatives of the industry was possible, we have no jurisdiction to review the factual accuracy of this recital.
 
 
 11
 We turn now to the second procedural ground upon which the regulation is attacked. The authority conferred upon the President to combat inflation by the Defense Production Act of 1950 and the limitations and conditions upon the manner in which it may be exercised are contained principally in §§ 402(a), (b) and (c). Due to the importance of these sections to this and the following phases of the dispute we have reproduced them in the margin.[1]
 
 
 12
 Complainants contend that SR 5 is, within the language of § 402 (b) (2), a regulation with respect to "an individual material" as distinguished from one with respect to "materials * * * generally", and that the regulation is invalid since the statement of considerations failed to certify that the findings specified in § 402(b) (2) had been made. But we think SR 5 is not a regulation with respect to "individual materials" within the meaning of § 402(b) (2), as to which the findings are essential.
 
 
 13
 In § 402 Congress authorized three distinct procedures for combating inflation. The first of these, the one authorized by § 402(a), is the stimulation of voluntary action by business, agriculture, labor and consumers. The second, described in § 402(b) (2) as action dealing with "individual materials and services", is the imposition of selective price and wage controls on critical segments of the economy. The third type of action authorized is the utilization of general controls.
 
 
 14
 A reading of § 402 in its entirety indicates that Congress viewed selective controls (which might limit the prices a producer could charge without simultaneously limiting his costs) as a technique to be used only with the greatest caution. Consequently, special safeguards were set up to avoid inequities should selective controls be imposed.
 
 
 15
 The provisions of § 402(b) (3) and § 402(b) (4) were clearly designed to avoid the danger of unfairness inherent in applying controls to a part only of the economy. The first of these subsections requires that a producer's wage costs be controlled whenever a ceiling is placed upon his prices. The second, requiring the imposition of general controls when individual ceilings have been established on a substantial number of products, is intended to preclude gross distortions and inequities which might result were a large area of the economy subjected to controls while all other prices and wages were left free to fluctuate.
 
 
 16
 These subsections are obviously inapposite to the issuance of a special regulation applicable to a particular commodity at a time when controls upon wages and prices generally are in effect. The requirement of § 402(b) (3) that wage controls be imposed simultaneously with the imposition of price ceilings would be mere surplusage in such a situation, for wages would already be controlled. And the requirement of § 402(b) (4) that general controls be imposed once ceilings have been placed on materials and services comprising a substantial part of the economy would be meaningless at a time when general controls were already in effect.
 
 
 17
 It is our view that § 402(b) (2), in prescribing certain findings as conditions precedent to the establishment of ceilings on individual materials and services, was designed only to avoid the inequities of selective controls and is inapplicable to the promulgation of individualized regulations during a period of general controls. The first two of these findings, subsections (i) and (ii) of § 402(b) (2), forbid the imposition of a ceiling on an individual product except in the grave circumstance where an unreasonable price increase is threatened which will materially affect the cost of living or the national defense. Subsection (iii) requires generally that the imposition of the ceiling be necessary to effectuate the purposes of the Act. The last two findings, subsections (iv) and (v), limit authority to impose a selective ceiling to situations where such a ceiling would be practicable and feasible and would be generally fair and equitable to sellers and buyers of the product in question and also to sellers and buyers of related or competitive products.
 
 
 18
 As applied to the system of combating inflation by selective controls on a relatively few critical products, and in the light of the obvious congressional concern that the utilization of such selective controls might, if care were not taken, result in distortions and inequities, it makes sense to require these findings to be made. They limit the use of selective controls to the most critical areas of the economy and to situations where their use would not have an undesired effect upon the persons who were subject to them or upon others.
 
 
 19
 On the other hand, these findings would, by and large, be anomalous as prerequisite to the imposition of a tailored regulation on a particular product during a period of general controls. Congress can hardly be supposed to have intended to preclude the issuance, during such a period, of an individualized regulation for an industry already controlled by a catch-all regulation like GCPR, simply because prices in that industry had not risen and did not threaten to rise. If the general controls were effective, prices would be incapable of rising. And, the industry being subject to controls in any event, there would be no conceivable reason for denying it the advantages of the more particularized treatment accorded in a regulation promulgated especially for it after consultation with representatives of the industry. Nor does any reason suggest itself for applying subsection (ii) to deny an industry, whose products do not loom large in either the national defense or the cost of living, the advantages of having a tailored regulation substituted for the general one. Similarly, the finding specified by subsection (iv) with respect to the feasibility of imposing the ceiling performs a meaningful function only as applied to selective controls and in the light of the danger involved in their use.
 
 
 20
 The legislative history of the Defense Production Act lends ample support to these conclusions. H.R. 9176, the original Defense Production Bill, as it passed the House, contained an amendment which provided for the imposition of ceilings either on individual products or on products generally. 96 Cong.Rec. 12219, 12221 (1950). The bill was then passed by the Senate, amended, however, so that it permitted general controls only. 96 Cong.Rec. 12893, 12896, 12910 (1950). The present provision is a compromise allowing individual ceilings only under certain specified conditions which tend to minimize the dangers inherent in selective controls. See Conference Report accompanying H.R. 9176 (Aug. 31, 1950) at pp. 31-32.
 
 
 21
 This is not to suggest that there is no statutory guide to be followed by the Director in issuing general controls, or tailored regulations on specific products during a period of general controls. Section 402(c) details the various factors and considerations which are relevant to and which should be considered upon the issuance of such controls. Indeed, the findings specified in subsections (iii) and (v) of § 402(b) (2), that the proposed ceilings will effectuate the purposes of the Act and will be generally fair and equitable, the only ones which would be meaningful as applied to the issuance of tailored regulations during a period of general controls, are reiterated in § 402(c).
 
 
 22
 This brings us to the final asserted procedural infirmity, that the Director in issuing SR 5 did not ascertain and give due consideration to the relevant factors set forth in § 402(c) of the Act, and proceeded without full or adequate data.
 
 
 23
 Whether this allegation states a cause of action depends upon whether the provisions of § 402(c) listing the data to be considered in exercising authority under the Act is mandatory, or merely directory. In its baldest form, the question is whether a ceiling price regulation, the substantive provisions of which may in fact be shown to be generally fair and equitable and in accordance with the policies of the Act, must nevertheless be invalidated upon proof that it had been issued without adequate consideration of the factors listed. In Safeway Stores, Inc. v. Bowles, Em.App.1944, 145 F.2d 836, certiorari denied, 1945, 324 U.S. 847, 65 S.Ct. 683, 89 L.Ed. 1408, we rejected a similar contention under the Emergency Price Control Act, stating, 145 F.2d at page 845:
 
 
 24
 "It must be remembered that the Emergency Price Control Act imposed upon the Administrator the Herculean task of stabilizing the price structure of a great nation and of doing so with unprecedented speed under the immediate threat of inflation. We think that under such circumstances the Administrator is entitled to be judged by the results of his acts and not to be subjected retrospectively in the calm of the judicial study to a hypercritical appraisal of the reasonableness of each of the steps by which, under the stress of the emergency, his acts were decided upon. It is enough if in the exercise of judgment he has promulgated regulations which are generally fair and equitable and are such as will effectuate the purposes of the act."
 
 
 25
 Similarly, we conclude that these provisions of § 402(c) of the Defense Production Act are directory only, that Congress did not impose upon this court the function of weighing the adequacy of the data before the Director at the time he acted. The general tone of § 402(c) is clearly suggestive rather than mandatory. The section simply lists in the broadest terms the economic data relevant to the exercise of power under the Act, in general, and in certain specified situations. The President is told "So far as practicable" to give "due consideration" to the listed factors unless he regards them as "not generally representative", in which case data are to be utilized which "in the judgment of the President" are generally representative. The specific provisions similarly call for due consideration of enumerated factors and such other "factors as he may determine to be of general applicability".
 
 
 26
 Furthermore, the preliminary administrative "duties" created by § 402(c) are so vague and generalized that they are not susceptible to fruitful judicial review. In large part, the listed factors are loose concepts, so that we could not decide whether or not they had been "ascertained" without having some notion of our own as to their meaning in the context in question. Also, just what may be "due consideration" with respect to any given factor in a particular situation is clearly a matter of delicate economic judgment which a court could not review in any significant manner without the risk of substituting its own judgment for that of the Director. When this indefiniteness is compounded by the qualification that the data need be considered only "so far as practicable", the conclusion seems inescapable that it is not our function to determine whether the Director, prior to the issuance of a regulation, ascertained and gave due consideration, so far as practicable, to the factors listed in § 402(c).
 
 
 27
 There remain for discussion the substantive aspects of complainants' challenge to the regulation, that is, their attack upon the pricing technique employed by the Director. Complainants allege, first, that the regulation is arbitrary and discriminatory as to used car dealers in that it subjects them to ceilings based on average prices prevailing during the base period rather than upon maximum prices such as are utilized in GCPR. Secondly, they contend that the regulation is arbitrary in that it fails to provide differentials in price for variations in mechanical condition. Thirdly, the regulation is asserted to be confiscatory as to complainants and as to most of the members of the used car industry. We shall consider these objections in turn.
 
 
 28
 We see no merit in the contention that the guide books could not properly be utilized because the prices they quoted were mean rather than maximum prices. The statement of considerations accompanying SR 5 indicates that pricing from used car guides was an industry practice of long standing. GCPR created distortions as applied to used car dealers only because during the base period some dealers, in the face of inflationary pressures, had departed from this practice. As a result some dealers under GCPR had the advantage of abnormally high ceilings with respect to certain models, and the industry's usual degree of stability was disturbed. The statement of considerations notes further that the ceilings instituted by the regulation were based on the prices quoted in the guide books in use during the base period; since these prices were the norms around which actual prices during that period fluctuated, the general level of prices under SR 5 would not vary greatly from those which had been in effect under GCPR. The principal effect of the temporary guide book regulation was, apparently, to reduce the ceilings of those dealers who had during the base period sold one or more models at abnormally high prices and, at the same time, to increase the ceilings of those who during the same period had sold given models at unusually low prices, perhaps because the cars in question were in bad condition. In short, the intent and effect of the regulation were to level out extreme fluctuations in the pattern of ceiling prices.
 
 
 29
 The complaint does not controvert any of these statements. Complainants' position seems rather to be that dealers have a vested right to continue selling at the highest prices at which they made sales in the base period prior to the imposition of controls, however much these prices may have deviated from the average prices then prevailing in the industry.
 
 
 30
 This, of course, is untenable. If prices substantially in excess of those generally in effect, and at which unrepresentative sales were made by a few dealers, were to prevail as the ceiling prices for those dealers, the entire price structure of the industry would be subjected to inflationary pressure. The dealers with the abnormally high ceilings, being able to buy at substantially higher prices than their competitors, would absorb an undue share of the limited number of cars coming on to the used car market. These cars would then be sold at the highest prevailing ceilings. The tendency would be for the abnormally high prices during the base period to become the prevailing prices during the period of control. Moreover, the uniquely advantageous competitive position of dealers with high ceilings would put undue pressure upon the more numerous dealers with low ceilings to disregard their individual ceilings in order more effectively to compete. This could result in the complete collapse of the system of control.
 
 
 31
 Characterizing the utilization of the average prices reflected in the guide books as "discriminatory", because GCPR uses as the ceiling each individual seller's highest price during the base period, does not advance complainants' argument. We frequently had occasion, under the 1942 price control legislation, to inquire into the validity of maximum pricing techniques established by the Administrator to meet the peculiar needs of various industries in which diverse conditions and pricing policies prevailed. In several cases we upheld techniques which differed as greatly from the freeze-date type of control utilized in the General Maximum Price Regulation issued under that Act (7 F.R. 3153) as does the guide book system from the GCPR currently in effect. E. g., Pacific Gas Corp. v. Bowles, Em.App.1946, 153 F.2d 453; Armour & Co. v. Bowles, Em.App.1945, 148 F.2d 529, certiorari denied, 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989; Montgomery Ward & Co., Inc. v. Bowles, Em.App.1945, 147 F.2d 858; Counselman v. Fleming, Em.App.1947, 161 F.2d 203, certiorari denied, 1947, 331 U.S. 861, 67 S.Ct. 1756, 91 L.Ed. 1867.
 
 
 32
 Undoubtedly a price regulation might be held invalid because of unwarranted discrimination between individuals similarly situated with respect to all pertinent factors. Hawaii Brewing Corp., Ltd. v. Bowles, Em.App.1945, 148 F.2d 846; Booth Fisheries Corp. v. Bowles, Em.App.1946, 153 F.2d 449. But this principle can have no application to sellers operating in distinct and unrelated industries. It would seem obvious that in this case the relevant query is not whether used car dealers are treated differently from the purveyors of other products, but rather whether the regulation to which they are subject is appropriate in the light of the pricing practices and inflationary pressures prevailing in the particular industry. Reichel-Korfmann Co. v. Porter, Em.App.1946, 155 F.2d 730, 731. The answer here, in view of the uncontroverted matter set out in the statement of considerations, must be in the affirmative.
 
 
 33
 The suggestion that the regulation arbitrarily fails to take account of differences in mechanical condition of the used cars is equally lacking in merit. It would manifestly be impossible for the Director to establish a workable system of controls which sought to graduate ceiling prices to fit the precise mechanical condition of each individual car. The most that could be undertaken would be the establishment of various grades or classes into which each car would have to be placed. The difficulty which would be encountered in attempting to specify sufficiently definite objective standards upon which such classification could be based, and the problems which would be met in seeking to enforce such a regulation, would be grave indeed. This being so, we cannot say that the system of classification adopted is arbitrary. Classification on the basis of make, model and age is familiar to the industry and easy to administer. There being a considerable correlation between age and mechanical condition, the regulation does, in a general way, take mechanical condition into account, as well as more imponderable elements, such as style, which enter into the determination of demand and market value. This is all that is required. Fournace v. Bowles, Em.App.1945, 148 F.2d 97, certiorari denied, 1945, 325 U.S. 884, 65 S.Ct. 1573, 89 L.Ed. 1999. The regulation merely prescribes maximum prices; it does not require a dealer to exact the maximum price for a car in wretched mechanical condition.
 
 
 34
 The issue whether the regulation is confiscatory as applied to complainants and to most of the members of the used car industry cannot be definitely determined on the complaint and answer, which is all we now have before us.
 
 
 35
 On September 22, 1951, after the pleadings in this cause were filed, we issued an order directing complainants to "file a motion for judgment on the pleadings under Rule 16(b) or an application for leave to introduce evidence under Rule 18(a) within 10 days after service of this order."
 
 
 36
 Complainants' motion for judgment on the pleadings was made in response to that order. At the oral argument counsel for complainants stated that if they did not prevail on their motion they desired to be afforded an opportunity to introduce evidence. We indicated that in such event we would consider an application by complainants for leave to introduce evidence on relevant issues raised by the pleadings.
 
 
 37
 For the foregoing reasons, an order will be entered (1) denying complainants' motion for judgment on the pleadings, (2) denying respondent's motion to dismiss the complaint on the ground that on its face it fails to state a claim upon which relief can be granted, and (3) granting respondent's motion "to strike each and every allegation of the complaint (except paragraphs I, II, III, and IV)", with the qualification that paragraph V and subparagraph 10 of paragraph VI and the prayer for relief will not be stricken. Unless within fifteen days after receipt of service of this order complainants file an application under our Rule 18(a) for leave to introduce evidence, a judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 "Sec. 402. (a) In order to carry out the objectives of this title, the President may encourage and promote voluntary action by business, agriculture, labor and consumers. In proceeding under this subsection the President may exercise the authority to approve voluntary programs and agreements conferred on him under section 708, and may utilize the services of persons and agencies as provided in section 710
 "(b) (1) To the extent that the objectives of this title cannot be attained by action under subsection (a), the President may issue regulations and orders establishing a ceiling or ceilings on the price, rental, commission, margin, rate, fee, charge, or allowance paid or received on the sale or delivery, or the purchase or receipt, by or to any person, of any material or service, and at the same time shall issue regulations and orders stabilizing wages, salaries, and other compensation in accordance with the provisions of this subsection.
 "(2) Action under this subsection may be taken either with respect to individual materials and services and to individual types of employment, or with respect to materials, services, and types of employment generally. A ceiling may be established with respect to an individual material or service only when the President finds that (i) the price of the material or service has risen or threatens to rise unreasonably above the price prevailing during the period from May 24, 1950 to June 24, 1950, (ii) such price increase will materially affect the cost of living or the national defense, (iii) the imposition of such ceiling is necessary to effectuate the purposes of this Act, (iv) it is practicable and feasible to impose such ceiling, and (v) such ceiling will be generally fair and equitable to sellers and buyers of such material or service and to sellers and buyers of related or competitive materials and services.
 "(3) Whenever a ceiling has been imposed with respect to a particular material or service, the President shall stabilize wages, salaries, and other compensation in the industry or business producing the material or performing the service.
 "(4) Whenever ceilings on prices have been established on materials and services comprising a substantial part of all sales at retail and materially affecting the cost of living, the President (i) shall impose ceilings on prices and services generally, and (ii) shall stabilize wages, salaries, and other compensation generally.
 "(5) In stabilizing wages under paragraph (3) of this subsection, the President shall issue regulations prohibiting increases in wages, salaries, and other compensation which he deems would require an increase in the price ceiling or impose hardships or inequities on sellers operating under the price ceiling.
 "(c) So far as practicable, in exercising the authority conferred in this section, the President shall ascertain and give due consideration to comparable prices, rentals, commissions, margins, rates, fees, charges, and allowances, and to comparable salaries, wages, or other compensation, which he finds to be representative of those prevailing during the period from May 24, 1950, to June 24, 1950, inclusive, or, in case none prevailed during this period or if those prevailing during this period were not generally representative because of abnormal or seasonal market conditions or other cause, then those prevailing on the nearest date on which, in the judgment of the President, they are generally representative. The President shall also give due consideration to the national effort to achieve maximum production in furtherance of the objectives of this Act. In determining and adjusting ceilings on prices with respect to materials and services, he shall give due consideration to such relevant factors as he may determine to be of general applicability in respect of such material or service, including the following: Speculative fluctuations, general increases or decreases in cost of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the material or by persons performing the service, subsequent to June 24, 1950. * * * Any regulation or order under this title shall be such as in the judgment of the President will be generally fair and equitable and will effectuate the purposes of this title, and shall be accompanied by a statement of considerations involved in the issuance of such regulation or order. The President, in establishing and adjusting ceilings with respect to materials and services, and in stabilizing and adjusting wages, salaries, and other compensation, shall make such adjustments as he deems necessary to prevent or correct hardships or inequities.